[L. A. No. 22566.   In Bank.   Aug. 19, 1953.]

W. JOSEPH CHOATE, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

400

John W. Preston for Petitioner.

Stanley A. Barker and Jerold E. Weil for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of The State Bar[1] that petitioner, W. Joseph Choate, be suspended from the practice of law in this state for a period of one year. The board approved and adopted findings of fact of a local administrative committee which had also recommended a year's suspension.

The charges against petitioner are based upon certain of his actions in connection with the administration and distribution of the estates of Henry W. Morse and his wife, Amy Harding Morse, both deceased. The evidence is without substantial dispute, save as to the inferences to be drawn therefrom, and we have concluded that on any reasonable view of such evidence petitioner does not appear to have been guilty of any act involving moral turpitude or dishonesty or overreaching and that the most that can be inferred against him is that perhaps he relied too readily and too heavily upon the word and advice of others, whom, however, he had no reason to distrust. Because we have concluded that no disciplinary action whatsoever is justified the facts are set out in considerable detail.

In 1931 or 1932 petitioner became acquainted with Henry W. Morse, who was then manager and part owner of a hotel near Ojai, Ventura County, California, and with Mrs. Morse, and thereafter had various social and professional contacts with them. In October, 1934, Mr. Morse executed a will prepared for him by petitioner, in which Mrs. Morse was named as executrix and as principal beneficiary and residuary legatee. Mr. Morse died in July, 1937, and was survived by his wife, who then resided in Massachusetts. Upon her nomination Letters of Administration With the Will Annexed were issued to petitioner by the superior court in Ventura County, in Mr. Morse' estate, and on January 18, 1941, a final decree of distribution was made ordering distribution of the property to Mrs. Morse. Included in such property were seven trust deed notes of the face value of one thousand dollars each, issued by the Ojai Improvement Company to Mr. Morse, dated April 1, 1933. The notes, appraised at their face value in Mr. Morse' estate, were part of a total issue of $45,000 secured by a trust deed upon the Ojai hotel property mentioned above and upon some 90 acres of unimproved land near

---

[1] Adopted by the affirmative vote of 10 of the 13 board members present and voting.

Ojai. These notes figure prominently in the contentions of the bar.

In March, 1938, Mrs. Morse executed a will, prepared by Mr. Edmond H. Talbot, a Boston attorney, in which petitioner was named as executor and as beneficiary of one-half of the residue. Mrs. Alma Farrar, a cousin of Mrs. Morse, was named as beneficiary of the other one-half of the residue. On February 5, 1941 (i.e., some two and one-half weeks after Mr. Morse' estate was ordered distributed), Mrs. Morse died in Massachusetts. Following a contest, her will was admitted to probate in May, 1942, letters testamentary were issued to petitioner in the probate court for Norfolk County in Massachusetts, and Mr. Talbot was appointed ''resident executor in Massachusetts'' of Mrs. Morse' estate. As executor of the will of Mrs. Morse, petitioner received possession of the property distributable to her from the estate of her husband and delivered it to Mr. Talbot. Such property consisted of the seven $1,000 trust deed notes, some $1,285 in cash, and certain stock which later proved valueless.

Mrs. Morse' estate had an appraised value of some $8,258, plus the seven notes. The Massachusetts appraiser appointed by the probate court of that state appraised the notes in Mrs. Morse' estate as of ''no value'' or ''value uncertain''; the appraisal also bears a notation that ''A letter from the president of the company [which issued the notes] . . . , under date of July 21, 1942, states 'there is no market for these notes.' '' After payment of debts except for something in excess of $4,000 due petitioner, and costs of administration exclusive of some $600 executor's fees due petitioner, and legacies, the property remaining to be distributed[2] to the two residuary legatees consisted of the notes, $400 in cash, and certain personal effects of negligible value. By agreement between Mrs. Farrar and petitioner as residuary legatees, the $400 cash was, in April, 1944, distributed to Mrs. Farrar as her share of the residue and petitioner received the notes and the personal effects. In reaching the agreement consideration was given to the fact that petitioner had not been paid the fees of $600 due him as executor of Mrs. Morse' estate and that he had a claim against the estate in the sum of $3,500, plus interest thereon for some five years, based on a debt owing him from Mrs. Morse and evidenced by a writing

---

[2]A balance remained to be distributed because petitioner agreed to waive the payment of sums due him in consideration of distribution to him of the mentioned notes.

hereinafter mentioned; these sums due to petitioner aggregated some $5,000.

Thereafter, in February, 1946, petitioner learned of the possibility that the estate of Henry W. Morse was entitled to share in another estate which was then being administered in New Hampshire. Petitioner alertly pursued the matter, and following the expenditure of various efforts on his part he collected, in 1947, the sum of $1,328.58, which represented Mr. Morse' distributive share of the New Hampshire estate. Thereupon, on July 31, 1947, petitioner (who as related hereinabove had previously been discharged as administrator of the estate of Mr. Morse), after consulting with the judge of the superior court in Ventura County, California, and explaining the facts to him, filed an account and petition in that court. Such document was entitled "Account of Administrator of After-discovered Property, Report, Petition for Extraordinary Fees for Services Rendered and Petition for Distribution"; it contained the following allegations: "That the undersigned Administrator with the Will Annexed, JOSEPH CHOATE, Esq., has heretofore rendered his First and Final Account, Report and Petition for Distribution which has heretofore been Ordered by the Court, and finally settled." After also setting forth the facts that he had received the $1,328.58 and had performed extraordinary services in obtaining such sum, petitioner's account and petition continued, "That your Petitioner, as Administrator with the Will Annexed, has acted as his own counsel in said matter . . . WHEREFORE, said Administrator with the Will annexed, JOSEPH CHOATE, Esq., and petitioner herein asks that said Account of After-discovered property be approved, allowed and settled and that the Administrator's extraordinary fees and expenses be fixed in the sum of $500.00, and that a Decree be made for the distribution of said estate to the person or persons entitled thereto, to-wit, the whole thereof to Amy H. Morse under the provisions of the Will of the deceased and for all other proper relief." The court thereafter made and entered an order settling the account, allowing petitioner the $500 fee, plus $3.50 expended as costs, and ordering the balance of the money (i.e., $825.08) distributed to Mrs. Morse. Since under Mrs. Morse' will the after-discovered asset was distributable one-half to petitioner and one-half to Mrs. Farrar, petitioner in December, 1947, sent a check for $412.54 (being one-half of the balance) to Mrs. Farrar together with a letter stating in effect that such sum was her share of an

after-discovered asset of Mr. Morse' estate which "Mr. Talbot has requested me to remit . . . to you as one of the two residuary beneficiaries of Mrs. Morse' estate, under the provisions of her will." Petitioner also enclosed a receipt for the money, which Mrs. Farrar signed and returned to him and which petitioner then sent to Mr. Talbot.

The findings of fact made herein by the local committee and adopted by the board of governors recite that in reaching the settlement with Mrs. Farrar as to a division of the residue of the estate of Mrs. Morse petitioner knowingly and "actively misrepresented the circumstances surrounding the value of the [seven $1,000] notes by characterizing" a sale which had been made of the hotel property securing the notes, and cash payments made on the sales price, as a rental rather than as a sale, and by representing the value of the notes at the time of the settlement "to be twenty cents on the dollar, or less, whereas, . . . [petitioner] then well knew that the value placed on them by the president of the corporation [issuing them] was fifty cents on the dollar." It was further found that petitioner, as executor of Mrs. Morse' estate, "had a fiduciary relationship to his co-beneficiary" Mrs. Farrar, which he violated by not informing her of various other facts concerning the value of the notes and of the property by which they were secured. With respect to the $1,328.58 received by petitioner as an after-discovered asset of Mr. Morse' estate, it was found that petitioner made false representations to the probate court in Ventura County that he had performed extraordinary services *as administrator* in obtaining such money, although he had actually been discharged as administrator, and further that petitioner "failed to report honestly and fully to" Mrs. Farrar the amount received "or that he had taken the sum of $500.00 as a purported fee for his services." It was further found that the "purported order" allowing the fee "was void and beyond the jurisdiction of the court by reason of respondent's [petitioner's] having been discharged as administrator," and the committee concluded that petitioner "has withheld from Mrs. Farrar" for his own use and benefit the sum of $250 (being one-half of the fee allowed him by the Ventura court) without her knowledge or consent. The committee further concluded that petitioner's conduct as related in the findings summarized hereinabove constituted a violation of his duties as an attorney "within the meaning of" sections 6067, 6068 and 6103 of the State

Bar Act (Bus. & Prof. Code), and also a violation of rule 9 of the Rules of Professional Conduct (33 Cal.2d 30).[3]

Section 6067 provides for the attorney's oath to support both federal and state Constitutions and faithfully to discharge the duties of an attorney. Section 6068 lists various of such duties of which only the following appear on any theory of the bar to be in any wise material or relevant here: to support both federal and state Constitutions and law, and to "employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." Section 6103 provides, so far as hypothetically here material, that an attorney's "violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension." Petitioner was not found guilty of violating section 6106, which provides for discipline following an act of moral turpitude, dishonesty or corruption.

Petitioner strongly contends that the evidence overwhelmingly shows that he has not committed any unprofessional or unethical act or otherwise violated the State Bar Act or the Rules of Professional Conduct, and that therefore no basis exists for discipline. ▆▆ This court is not bound by the findings of fact of the local committee and the board, and in reviewing a recommendation for discipline we pass upon the sufficiency and weight of the evidence. ▆▆ Petitioner has the burden, however, of showing that the recommendation of the board is erroneous or unlawful. '(*Clark* v. *State Bar* (1952), 39 Cal.2d 161, 165 [246 P.2d 1], and cases there cited.) This burden, we are convinced, petitioner has fully sustained.

In considering the evidence herein, it may be noted preliminarily that at the time of the hearing before the board of governors petitioner asked leave to introduce additional evidence consisting of some 30 affidavits, letters and documents bearing upon the charges against him. The board refused to admit the additional evidence but did lodge and mark it for identification and has transmitted it to this court. Petitioner asks that this court consider such evidence in this review, and also consider two affidavits which he has sub-

---

[3]Rule 9: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client."

mitted subsequent to the granting of his petition for review. An inspection of all of such evidence makes manifest that it has a material bearing upon the issues presented and should in the interests of justice be made a part of the record in this proceeding and considered by this court.

The first question presented is whether or not petitioner wilfully and fraudulently deceived Mrs. Farrar into making the settlement in the estate of Mrs. Morse, whereby Mrs. Farrar received $400 in cash and petitioner received the seven one thousand dollar trust deed notes. The evidence as to the circumstances leading up to and surrounding the settlement is extensive and detailed, but for the purposes of this review may be summarized as follows:

Following Mr. Morse' death in 1937, Mrs. Morse employed petitioner to advise her and at her request he made numerous trips to Massachusetts to confer with and represent her. In 1937 she paid him $200, and between February, 1938, and April, 1939, she paid him further sums totaling $7,500. In April, 1939, she discontinued his services and signed an authorization for him to withhold from Mr. Morse' estate an additional sum of $3,500 for services rendered to her personally. When Mrs. Morse died in February, 1941, the $3,500 remained unpaid to petitioner. Petitioner therefore filed the $3,500 claim with Mr. Talbot, the Boston attorney and resident executor[4] who was administering Mrs. Morse' estate in Massachusetts. According to the testimony of an office associate of Mr. Talbot, the latter, pursuant to Massachusetts practice, then listed the claim "in the regular Affidavit of Debts and Expenses, which was filed with the Commissioner of Taxation in Boston. Mr. Choate's claim among others was accepted by the Commissioner, and this established the validity of the claim with the Commonwealth of Massachusetts. . . . In this state there is no judicial determination of a claim filed against an estate until the account showing the payment of said claim is allowed unless it is protested before payment.'' Mr. Talbot thereupon wrote petitioner early in December, 1943, that ''all claims against the estate have been gotten out of the way except your claim of $3500.00 embodied in the letter from Mrs. Morse to you, which claim we established and was included in the Affidavit of Debts and Expenses which was filed with the Massachusetts Inheritance Tax Commissioner.

---

[4]Appointed pursuant to the requirements of Massachusetts law. (Vol. 6, Annotated Laws of Mass., ch. 195.)

"I think you are sufficiently conversant with the intricacies of the Estate and what we have been through to enable you, yourself, to write Mrs. Farrar and make the offer which you have suggested, viz., giving her the balance of the cash in the Estate and you taking the notes for your claim. There was due in November, $140.00 semi-annual interest on these notes. I have not received a check. Do you know whether Mr. Sheridan is making the payment or not? I had an idea if the interest were paid you might offer Mrs. Farrar $350.00 and you take the notes at the same amount of $350.00, and when you file your first and final account as executor, the two residuary legatees, Mrs. Farrar and yourself, would, in the account, each be paid these two items of $350.00 each.

"Therefore, when you have settled with Mrs. Farrar, please let me know the terms, and I will prepare your first and final probate account as executor and send it on to you for signature and verification."

Thereafter, on December 14, 1943, petitioner wrote to Mrs. Farrar,[5] who lived in Maine. In the letter he reviewed the debts and expenses of the estate, and the specific legacies which had been paid, and then continued, "we come to the embarrassing fact that the residue and balance of the estate, as just received from Mr. Talbot, consists of $268.00 and seven trust deed notes of questionable value which formerly belonged to Mr. Morse' estate. At this point may I state that this balance does not take into consideration the fact that I have an allowed claim of $3,500 yet unpaid for my legal services rendered to Mrs. Morse over a period of several years. . . . I received a letter from Mrs. Morse by which she . . . authorized and directed me to withhold from her husband's estate, then in the process of being probated, the sum of $3,500.00 in payment of this obligation. I am enclosing a copy of that letter which Mrs. Morse sent me . . . and which is the basis for the claim of $3,500.00 which I filed with the estate and which has been approved and allowed by the Court. As I have stated above, however, this claim has never been paid, owing to the condition of the estate, and is the only outstanding obligation.

"With relation to the above-mentioned seven trust deed

[5]Because Mrs. Farrar was then 87 years of age and feeble from illness her son, Leo W. Farrar, with whom she lived, acted for his mother in making the settlement with petitioner. Petitioner's letter was addressed to the son's wife, who carried on the correspondence with petitioner on behalf of her husband and her mother-in-law.

notes, may I give you a bit of their background, as they now form the only asset in the estate outside of the cash sum of $268.00 . . .''

In his letter, petitioner then reviewed briefly the history of the Ojai hotel property securing the notes, and then continued, ''The seven Trust Deed Notes . . . were defaulted in both principal and interest and became practically valueless. The Hotel closed in 1936 and remained vacant . . . and these Trust Deed Notes had no market whatsoever. In 1941 the Notes were reputed to be worth 20¢ on the dollar and even at that figure there was no sale for them. There are $45,500 worth of these Notes outstanding, and from time to time the Noteholders have all signed extension agreements merely to accomodate the [hotel] Company. Two years ago these Notes were again extended and now their date of maturity is 1954, more than ten years hence . . . Therefore, under these circumstances, it seems doubtful whether my claim can ever be paid in full . . .

''There seems to be only one suggestion for me to make, and that is that Mrs. Farrar take the cash remaining in the estate, being $268.00 and I will take the seven trust deed notes and hope that eventually they will partially recover in value. 1954, the date of their maturity is a long ways off. A private boys' school has recently rented the Hotel for its accomodations, but as you know a private school is always an uncertain venture . . . If the Trust Deed Notes had any appreciable value at the present time I would request Mr. Talbot to petition the Court for authorization to sell them at this time in order to satisfy my claim, but due to their present negligible value, which is probably in the neighborhood of 20¢ on the dollar, this would be an unwise step to take. . . .

''If you wish to verify any of the facts as I have outlined them to you, you may communicate directly with Mr. Edmund H. Talbot . . . or if you wish to obtain any information concerning these Trust Deed Notes, you may communicate with Mr. Robert M. Sheridan, Bank of America Building, Ventura, California, who is president of the Company which issued these Notes . . .''

Petitioner received no immediate reply from Mrs. Farrar, and the following month, on January 12, 1944, again wrote her, ''to ask what you wish me to do in the matter''; he also mentioned that he had received no fees or compensation in the estate, again suggested that for further information she

communicate directly with Mr. Talbot and Mr. Sheridan, and requested an answer.

Still receiving no reply from Mrs. Farrar petitioner wrote to Mr. Talbot, relating his offer of settlement and that he had heard nothing from her, and asking Talbot ''if you can suggest some way whereby we can proceed to sell the seven trust deed notes and thereby permit me to properly buy them in to satisfy my claim, or to if possible sell them for more than $3500.00 if anyone cares to pay it and then have the overage remain as part of the residue to be distributed, after paying me my claim. I recall that you made some such suggestion many months ago, so if it can be done I think we had better proceed. Naturally I am anxious as you are to close the estate and apparently we will have no cooperation from Mrs. Farrar, therefore can we expedite matters by resorting to proper Massachusetts procedure. Mrs. Farrar, is in her late nineties and I feel that time is an important factor now. May I have you[r] good judgment and suggestion on this . . .'' At Talbot's request, petitioner also sent him copies of the letters written to Mrs. Farrar.

Thereafter, on February 10, 1944, Mr. Talbot, who had previously been informed by Mr. Sheridan that there was no market for the notes, wrote to Mrs. Farrar concerning closing the estate, and inquiring whether she wished to accept petitioner's suggestion of settlement.[6] Mrs. Farrar, acting through her son, Leo Farrar, accepted the settlement offer, and Mr. Talbot prepared the first and final account of petitioner as executor of Mrs. Morse' will. Both petitioner and Mrs. Farrar signed the account and requested that it be al-

[6]Mr. Talbot's letter is as follows: ''Mr. Choate has forwarded to us the correspondence between you and him, with reference to the adjustment with you of his claim against the Morse estate. We, as you know, attended to all legal matters here in Massachusetts, but as to the final adjustment between you and him, we thought, under the circumstances, it would be better for him to do so directly with you.

''It is unfortunate that there should have been almost three years of litigation in this estate, which was not a large one in value. Mr. Choate has, in his letters, acquainted you with all the details, and we need not go further into the matter.

''The situation today is this: all claims against the estate have been satisfied except that of Mr. Choate's claim of $3500. A similar claim in favor of one Lee for $3500. against the estate on a written order signed by Mrs. Morse was litigated in court, and the Judge found it to be valid, and likewise the court's decision validates Mr. Choate's claim. We settled with Mr. Lee for a much smaller amount than the court found to be due him.

''The only remaining assets in the estate to satisfy Mr. Choate's claim are approximately $400. in cash, and the Ojai Valley, California,

lowed, and it was allowed by the Massachusetts probate court in April, 1944. It shows payment to Mrs. Farrar, as residuary legatee, of the $400 balance of cash in the estate, and distribution to petitioner, also as residuary legatee, of "balance personal property, inventoried 'No Value [i.e., the seven notes].' "

It is upon petitioner's letter of December 14, 1943, to Mrs. Farrar that the charges of fraudulent misrepresentations to her in connection with the settlement are chiefly based. Firstly, petitioner's statement in that letter that his claim of $3,500 "has been approved and allowed by the [Massachusetts] Court" is attacked as not being supported by the evidence. The evidence shows, however, that although the claim apparently had not been approved and allowed pursuant to the procedure followed in California, it had been "validated" both by the "Commissioner of Taxation in Boston" and by the "court's decision," and petitioner in making his statement was relying upon his understanding of Massachusetts practice and of the steps taken thereunder as related and indicated to him by Mr. Talbot, the Massachusetts attorney of some 50 years' experience who had the actual handling of Mrs. Morse' estate. We note that Mr. Talbot's letter to Mrs. Farrar (quoted in footnote 6, hereinabove) also informed her that "the court's decision validates Mr. Choate's claim." Under such circumstances it appears that petitioner's statement cannot fairly be said to constitute culpable misrepresentation nor does it by any stretch of reasonable inference appear that Mr. Choate could have had any thought of personal gain by the representations he made.

---

notes. These notes were inventoried at 'no value' by the appraiser appointed by the Probate Court.

"Under the will, you and Mr. Choate are named as residuary legatees. The Ojai Valley notes, being of no value, he could apply both the $400. cash and these notes, toward the satisfaction of his claim, and there would be nothing left for either of you as residuary legatees.

"Being thus placed in a dual position, to adjust the matter, he is willing to turn over to you the $400. cash and take his chances with the notes, to satisfy in part his claim against the estate.

"There is no market for these notes. They will not become due for about ten years. If they had any appreciable value, it would be his duty to put them up at auction in either Boston or Los Angeles, but undoubtedly no one would make a bid for them, unless you cared to do so.

"We are anxious to close the estate in the court, and get rid of it.

"You, of course, must make your own decision in the matter, as we cannot advise you.

"If you accept the $400. cash, please let us know, and we will draw up the final account, and after it is signed by you and Mr. Choate, we will have it allowed by the Judge."

Petitioner admittedly made two apparently inadvertent and inconsequential factual misstatements in the same letter, which it is also charged show, together with his failure to mention various other matters in connection with the notes and the property securing them, that he was attempting to fraudulently induce Mrs. Farrar to make the settlement with him. He stated that the maturity date of the notes, after the last extension thereof, was 1954, whereas it was 1952. He also stated that the hotel had been rented to the private boys' school, whereas it had actually been sold to the school. Petitioner testified that the reason for these two misstatements is that he wrote the letter late at night at his home following a long distance telephone call from Mr. Talbot, whereas the files containing accurate information were at his office. He also produced evidence showing that several extensions of the maturity date of the notes had been sought and that on a prior occasion one extension had been granted by agreement between the various noteholders; and also that preliminary negotiations with the boys' school (of which petitioner had been informed by Mr. Sheridan, president of the hotel company) actually contemplated and involved a lease rather than sale of the property. Although he stated to Mrs. Farrar that the "present negligible value" of the notes "is probably in the neighborhood of 20¢ on the dollar" despite the fact that Mr. Sheridan had some eighteen months earlier expressed his own opinion that the notes should be appraised in Mrs. Morse' estate at "about fifty cents on the dollar," instead of the inventoried "value uncertain" or "no value" fixed by the appraiser appointed by the probate court, we are disposed, in view of the fact that ideas as to the value or lack of value of the notes varied somewhat widely, and that petitioner expressly suggested that Mrs. Farrar communicate with Sheridan (who apparently attributed a higher possible value to them than did any other person but who admitted that there was no market for them) for further information, to accept his earnest argument that he did not intentionally or fraudulently seek to mislead Mrs. Farrar into a settlement less advantageous to her than it might otherwise have been. Even if we assume that the notes were potentially worth fifty cents on the dollar it seems almost certain that Mr. Choate could have forced their sale for a sum substantially less than enough to pay his approved claim. Such claim of petitioner against Mrs. Morse' estate, with interest thereon, to-

gether with the $600 in fees which he had not yet received, amounted in all to some $5,000, which, in addition to waiving his right to one-half of the cash remaining in the estate, he settled by accepting notes for which there was no market and which at that time were certainly considered to be worth substantially less than their face value.[7]   Apparently no one even suggested that they might, at the time concerned, be worth more than "about fifty cents on the dollar."  Moreover, the evidence indicates that Mrs. Farrar was eager to have the estate distributed and that both petitioner and Mr. Talbot made various unsuccessful efforts to sell the notes but were repeatedly informed there was no market for them.

■ Respondent State Bar also points out that three payments of interest (totaling $420) received on the notes were listed in petitioner's final account as executor of Mrs. Morse' will as "Sundry amounts of cash received," although the exact sources of various other much smaller amounts of income were given in the account.  It appears, however, that two of such payments were made directly to Mr. Talbot and that the third payment, originally sent to petitioner, was by him forwarded to Talbot.  Here again, also, the account was prepared by Mr. Talbot, upon whom petitioner relied in matters concerning administration of the Massachusetts estate, and we do not think petitioner can be fairly charged with intent to deceive Mrs. Farrar by the manner cash receipts were listed by Mr. Talbot.

■ Concerning the after-discovered asset of $1,328.58 which came into petitioner's hands as a part of the estate of Henry W. Morse, it is charged against petitioner that although technically Mrs. Farrar was not entitled to notice of the proceedings to distribute such asset because she was not an heir or distributee of the estate of Mr. Morse, nevertheless it was petitioner's duty to disclose to her the full amount of such asset and that he had applied for and obtained an allowance of $500 out of the sum for extraordinary services.  It is not charged that petitioner did not earn the $500 fee, or that

[7]It appears that in 1948, some four years after petitioner's settlement with Mrs. Farrar, a relative of the headmaster of the boys' school which had purchase the Ojai hotel property which secured the notes, paid off the notes in full, in order to help the school financially.  Shortly thereafter the school vacated the property and it has subsequently remained vacant.  Some three years later, in 1951, this disciplinary proceeding was instituted against petitioner.  He obviously cannot, however, be held to have acted, in negotiating with Mrs. Farrar in 1943 and 1944, with foresight as to what would happen in 1948.

it was not a reasonable allowance. The record indicates that Mr. Choate performed various services, including cooperation with and a personal visit to the New Hampshire attorney for the estate from which the asset was distributed to the Henry W. Morse estate. Under such circumstances it does not appear that petitioner has violated any duty of disclosure owing from him to Mrs. Farrar.

It further appears that, contrary to the finding of the local administrative committee and the board of governors, petitioner did not make false representations to or mislead the probate court in Ventura County in connection with the after-discovered asset. The augmented record establishes that when in January, 1946, petitioner first learned of the possibility that the Henry W. Morse estate had a claim to such asset he contemplated petitioning the court to reopen the estate and procured blank petitions for that purpose. Thereafter he discussed the matter with the judge of the probate court who had handled the proceedings in the estate, who suggested that if the money was received it could be distributed under the omnibus clause of the distribution decree already entered. Petitioner, as already related, subsequently received the money and reported it in full to the probate court in the hereinabove mentioned "Account of Administration of After-Discovered Property, Report, Petition for Extraordinary Fees for Services Rendered and Petition for Distribution." We agree with the judge of that court, whose letter expressing his views on the matter is in evidence, that although it may be assumed that (since petitioner had previously been discharged as administrator of Mr. Morse' estate, following the prior distribution thereof) it was technically incorrect to grant the extraordinary fee to petitioner without first expressly reopening the estate and reappointing him administrator, nevertheless "there is nothing in the situation . . . which involves wrongdoing or moral turpitude on" petitioner's part.

In view of the conclusions reached on the charges on which petitioner was found guilty, no useful purpose would be served by discussing in detail petitioner's contention that the disciplinary proceeding against him was initiated and pressed as the result of spite felt against him by a relative of Henry W. Morse, or by reviewing the evidence which appears to support his contention. It should further be mentioned, however, that the record contains evidence indicating that Mrs. Farrar's son and daughter-in-law are entirely satisfied both

with the settlement and with the remittance on the after-discovered asset. Mrs. Farrar was not a witness as she had passed on before the hearing in this matter.

Lastly, we are not disposed in such a proceeding as this to sustain the imposition of discipline against petitioner based on the "findings" of The State Bar that the "purported order" of the probate court of Ventura County allowing a fee of $500 to petitioner "was void and beyond the jurisdiction of the court" and the ensuing conclusion that therefore one-half of the $500 fee actually belonged to Mrs. Farrar and that petitioner by accepting such fee and depositing it in his own account was guilty of an improper act, including the commingling of his own money with money belonging to Mrs. Farrar.

For the reasons above stated the additional evidence submitted by petitioner is admitted as, and made a part of, the record in this proceeding. It is further ordered that this proceeding against petitioner be, and it is, dismissed.