[S. F. No. 19024.   In Bank.   Oct. 11, 1954.]

J. ADRIAN PALMQUIST, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Nathan G. Gray and Francis T. Cornish for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—Petitioner asks this court to annul a resolution adopted by the vote of eight of the thirteen members of the Board of Governors of The State Bar present and voting, that he be publicly reproved for violation of the rule against solicitation of professional employment by means of advertisement. (Rule 2, Rules of Professional Conduct, 33 Cal.2d 27-28.) Three of the five negative votes were so cast upon the ground that the degree of discipline was too severe. The proceedings were initiated by the board of governors, and at their request a preliminary investigation was made by a local committee which took testimony, unanimously concluded that further proceedings were not justified, and declined to issue a notice to show cause. The board nevertheless itself issued a show cause notice directing petitioner to appear before a local administrative committee. (See rules 20-25, Rules of Procedure of The State Bar.) The second committee, before whom the matter was heard on the show cause notice, after taking testimony concluded that while petitioner may have committed a technical violation of the rule against advertising, "such violation was not done with any intention of advertising or soliciting business or with any intention of violating Rule 2" and that no discipline should be imposed.[1] We have concluded that as determined by both the preliminary investigating committee and the local administrative committee, and as expressed by the examiner for The State Bar, it appears that petitioner had no intent to violate rule 2, and that no discipline should be imposed.

The facts appear to be undisputed. Petitioner was admitted to the practice of law in this state in 1937, and is now 46 years of age. With offices in Oakland, his practice consists exclusively of representing plaintiffs in personal injury cases. "About 85 percent of" such cases are referred to petitioner by other attorneys. He has been highly successful in his practice and has recovered substantial verdicts for his clients. In his trial work he has pioneered the use of medical

---

[1]Rule 2 provides in material part that "A member of the State Bar shall not solicit professional employment by advertisement or otherwise. . . . [N]othing in this rule shall be deemed to prevent a member from circulating among lawyers only, a brief, dignified notice that he is rendering a specialized legal service. . . ."

drawings to illustrate the injuries involved, and believes that such drawings constitute a much more effective means of portraying the injuries than do X-ray pictures.

The "successful use of medical drawings" came to the attention of the National Association of Claimants' Compensation Attorneys (NACCA), whose 1951 convention in San Francisco was attended by some 2,500 attorneys, including petitioner. Petitioner was invited to address the association's 1952 convention at Houston, Texas, on the "subjects of medical drawings in evidence and the effect of propaganda used by insurance companies to induce jurors to return low verdicts."

To illustrate his talk, and for distribution to his audience at the convention, petitioner engaged Gillick & Company, a printing firm in Berkeley, to print 10,000 copies each of two pamphlets and paid the firm some $3,500 therefor. Petitioner first considered ordering only 5,000 or 7,500 of the pamphlets but at the suggestion of Gillick & Company decided on 10,000 because the increased cost would be nominal. One of the pamphlets was entitled "Jury Tampering" and the other "The Use of Medical Drawings in Evidence."

The attendance at the Houston convention was one-fifth of that anticipated, and petitioner returned to Oakland with over 5,000 copies of each pamphlet. These he returned to Gillick & Company for storage. That company, upon learning that petitioner had no immediate use for the pamphlets, requested permission to mail copies of the two pamphlets to prospective printing customers as samples of the company's printing. Petitioner refused on the ground that he "regarded it as a professional paper and the nature of the subject might, or would be of direct interest to attorneys, perhaps Judges, but he didn't think it was proper to get into the hands of laymen. . . . [H]e said . . . he would not permit us to send them to business men and business executives." Following further discussion petitioner gave the company his permission to mail the two pamphlets to attorneys, judges, insurance brokers, and doctors, as persons who would have a professional interest in the subject matter. Mailings were thereupon made to some 1,485 doctors in San Francisco, 212 doctors in Contra Costa County, 862 doctors in Alameda County, 879 insurance brokers in San Francisco, to an unspecified number of judges and to more than 2,200 attorneys in the three counties; the names and addresses were secured by the printing company from telephone directories and petitioner took no part therein

or in the addressing and mailing. Neither did petitioner discuss with the company the territory to which mailings were to be made or pay any part of the mailing costs. The printing company chose to mail only in the three counties mentioned because "we expected . . . to follow up . . . with a personal interview in order to make the kind of a sale" they sought. Arthur Hargrave, Jr., a partner in the company, testified that "I had no idea of mailing these until I realized all that were left over. He came home, they are here—Holy Smoke! $3500 worth of printing—the wastebasket—terrific sample—that is how it happened." The company paid petitioner nothing and gave him no rebate for the pamphlet mailed, "He gave them to us." The mailing costs were defrayed by the printing company and "charged to advertising or promotion or both." Gillick & Company were trying "to reach a new field" of printing business in mailing the two pamphlets, and would have sent them to business executives if petitioner had consented. The company had "put on campaigns like this before on an average of maybe four or five or six a year." Such mailing of samples to prospective customers was customary with printing companies.

Accompanying the pamphlets when mailed was a letter from the company stating in part, "In your business perhaps you, too, have a specialty. In our printing business, we specialize in the design and production of distinctive reprints of magazine articles, speeches, or other subject matter, for the most part given away as institutional material. The enclosed booklets on 'Jury Tampering' and 'Medical Drawings in Evidence' by Adrian Palmquist, may be of particular interest to you because of the subject, but in addition, they serve as samples of the type of craftsmanlike design and production created in this plant." Hargrave testified that "This [mailing] campaign was geared solely to the type of professional man who might write a speech, a biography, a report, a semi-personal book; we publish a great many of such books. That is what this campaign concentrated on." The campaign "was done in the usual course of" the company's business and "conducted in the normal manner."

It was the mailing of the "Medical Drawings" pamphlet "with the knowledge and consent of" petitioner which the board of governors found was a "solicitation of professional employment by means of such advertisement."

Petitioner urges that not only was the medical drawings pamphlet primarily informative rather than being an ad-

vertising document, but that the discipline recommendation cannot stand because the board failed to determine that petitioner "wilfully employed advertising matter for the purpose of soliciting professional employment." (See Bus. & Prof. Code, § 6077.[2])

The medical drawings pamphlet under its title on the front cover is stated to be "By Adrian Palmquist and Germaine Young Palmquist." Germaine Young Palmquist is petitioner's wife. Inside the front cover of the pamphlet is the quotation, "One Picture is Worth Ten Thousand Words." On the inside of the back cover is the statement "This book was prepared for presentation to the National Association of Claimants' Compensation Attorneys as a supplement to the talk given by Adrian Palmquist at the National Convention, Houston, Texas, August 27-30, 1952." Within the cover, the pamphlet consists of 12 pages of which but one, the "Foreword," is text material. That page, illustrated by a sketch of an attorney apparently explaining a medical drawing to interested jurors, reads: "The admission of X-rays into evidence can no longer be denied.

"X-rays are merely pictures of distorted shadows which require the trained eye of a medical doctor to interpret.

"Medical drawings, however, open up a new field of understanding. They enable the layman to instantly and clearly grasp the real nature and extent of injuries.

"The pictures shown in this folder are reproductions of photographs of life-size drawings by Germaine Young Palmquist which were admitted in evidence in cases where plaintiffs were represented by Adrian Palmquist of Oakland, California."

Each of the other 11 pages of the pamphlet is devoted to a separate personal injury action in which plaintiff was represented by petitioner and contains one or more medical drawings of injuries as well as tabular factual information about the respective case, including title and court number, amount and date of verdict or settlement, title and location of the court and name of the judge, a brief statement of nature of the accident and of the defense of the action, and a description of the injuries involved. In seven of the cases the

---

[2]Section 6077: "The rules of professional conduct adopted by the board, when approved by the Supreme Court, are binding upon all members of the State Bar.

"For a *wilful* breach of any of these rules, a member may be disciplined by reproval or by suspension from the practice of law for a period not to exceed one year." (Italics added.)

name and address of "associate counsel" are also given. The verdict or settlement figures shown vary from a minimum of $22,500 to a maximum of some $212,500. About half the 11 actions listed were filed in Oakland or the vicinity thereof.

The pamphlet "Jury Tampering" which was mailed with · the medical drawings pamphlet was entirely textual. On the frontispiece it bears the notation "Address given by Mr. Adrian Palmquist of Oakland, California, before the National Convention of the National Association of Claimants' Compensation Attorneys, Houston, Texas, August 27-30, 1952." In general its six pages are devoted to the thesis that injured persons, particularly those suffering automobile accidents, do not receive sufficient compensation, particularly from insurance companies. Reference is made, among other matters, to news items and editorials concerning the increase in liability insurance premiums, to what is termed a "subtle propaganda program" of some insurance companies to prejudice the public against traffic victims, to unfavorable impressions allegedly given to prospective jurors of the injured person and his counsel, to the power of the trial court to set aside a verdict, to claimed improper acts of insurance adjusters, to the unwillingness of many attorneys to represent an injured person and to the contention that the average attorney is ill-prepared to cope with the "machinery supporting insurance counsel," and to the allegedly biased point of view of doctors. It concludes, "Jury tampering by prejudice and innuendo must stop. Just as we would rise to protect . . . [a] racial or religious group from persecution, we should likewise with militant conviction strive to jealously safeguard the civil rights of all injured persons as a group or as individuals."

Both before the local administrative committee and before the board of governors petitioner declared a conviction that persons injured in automobile traffic are not sufficiently compensated and represented himself as an avowed crusader to improve their lot and to undo the "gross injustices that are wreaked upon those people by insurance companies." He further testified that he has never and does not ever intend to represent any insurance company, that he has declined an offer of such representation because "I didn't think you could be both fish and fowl." With respect to mailing of the pamphlets he declared "There was never any intention on my part to do any advertising . . . [or to] get business from the publicity . . . I felt that after something like 16

years of practice and establishing myself in this field that I don't think I need to advertise . . . My intention in those books going out was this: to help lawyers in the presentation of these cases. And I hope . . . we can get more people who will do a better job for the injured side. Because if they can get more money for injured people than I can, it's going to help me." Petitioner could not attribute any new matter he had received to the distribution of any of the pamphlets, and since the mailing had received no referrals from doctors he did not already know. Both petitioner and his wife were widely acquainted in medical circles.

Petitioner confirmed that he consented to the mailing of the pamphlets by the printing firm, provided they went "to people that had a professional interest . . . I said insurance men . . . judges . . . Doctors, certainly, and lawyers. . . . I said they should not go to people except those with a professional interest, that would be the restriction. . . . I felt that doctors and lawyers have that same interest in common, Judges, . . . because about 79 per cent of all civil litigation is personal injury trial work. . . . I certainly never intended that they go to jurors, and I don't think they ever did." Petitioner's feeling "toward this picture" of alleged unfair activities by insurance companies was "one of the considerations" he had in mind in permitting the mailing, "I would be dishonest to deny that; certainly."

The notice to show cause charged petitioner with permitting the mailing of the pamphlets "to various persons . . . among whom were many who were not attorneys at law." The local administrative committee found, among other things, that petitioner consented to the mailing "on the specific understanding that . . . distribution would be . . . limited . . . to attorneys, doctors, judges and insurance brokers . . . for the reason that each group was professionally interested in the information contained in the pamphlets." The committee then set forth as its "conclusions" that the pamphlets "were not advertising documents but were primarily informative. The pamphlet 'The Use of Medical Drawings in Evidence' principally describes a method of presenting medical evidence in a more graphic manner than the oral testimony of a witness . . . Mr. Palmquist clearly endeavored to prevent an indiscriminate mailing of these pamphlets to the general public and by instructing the printing company to mail them only to attorneys, Judges, doctors and insurance brokers intended that they should only go to persons interested in the subject

matter. The intention of the printer in making the mailing unquestionably was to distribute the printing as a sample of their work rather than distribute the subject matter contained in the sample . . . Mr. Palmquist frankly admitted that one of his motives in publishing the pamphlet 'Jury Tampering' was to call to the attention of the members of the Bar his concern and indignation at the advertising campaign carried on by the insurance companies. To this extent such testimony indicated that his intention . . . was to meet and rebut this advertising campaign, and not an intention to advertise his extensive practice in personal injury cases or to solicit professional employment in violation of Rule 2.

"It is the conclusion of the Committee that while there may be a technical violation of Rule 2 by permitting the printer to distribute the pamphlets . . . , such violation was not done with any intention of advertising or soliciting business or with any intention of violating Rule 2. The Committee concludes no disciplinary action against Mr. Palmquist should be made."

Following an appearance by petitioner before the board of governors, at which the examiner for The State Bar declared, as he had done before the local administrative committee, that after his investigation he himself had concluded "that there is not a case against this man. I do not believe that he actually intended to solicit employment," the board adopted the "findings of fact" of the local committee and in addition found that the medical drawings pamphlet was mailed in the quantities and to the groups already listed hereinabove, and that "The said mailing of said [medical drawings] pamphlets to said persons with the knowledge and consent of respondent, was a solicitation of professional employment by means of such advertisement." The board's eight to five vote publicly reproving petitioner followed.

In reviewing a disciplinary proceeding this court passes upon the sufficiency and weight of the evidence and is not bound by the findings of fact of the local committee or the board. The burden of showing that the board's action was incorrect is upon petitioner, however. (*Choate* v. *State Bar* (1953), 41 Cal.2d 399, 405 [260 P.2d 609, 612].)

As noted by petitioner, he was neither charged with nor found guilty by the board of "wilfully" breaching rule 2 by soliciting professional employment by advertisement or otherwise. It is for a "wilful breach" of the rules of professional conduct that section 6077 of the Business and Pro-

fessions Code declares that a member of The State Bar may be disciplined by reproval or by suspension from the practice of law. Although petitioner admittedly concurred in the mailings which were made, he explicitly limited distribution to the four groups of persons for the reason, as found by both the local committee and the board, "that each group was professionally interested in the information contained in the pamphlets." Further, we believe it is reasonable to accept the viewpoint of the local committee that the medical drawings pamphlet, for the mailing of which the board voted to reprove petitioner, was primarily informative rather than being an advertising document. The State Bar in its brief states that "in format, the pamphlet to a layman would appear to be a dignified account of successes accomplished by an attorney, with the assistance of his wife, an expert in medical drawings, and in some cases with the assistance of 'associate counsel.'" That petitioner intended to attribute such successes to his newly developed method of illustrating injuries by the use of medical drawings, rather than to any personal prowess, and to encourage the use of such drawings by other legal practitioners seems to us to be the reasonable purport of the evidence. Under the circumstances we conclude that no intent to advertise or solicit business was shown, that no discipline should be imposed, and that the proceeding should be dismissed.

What is said above, together with the disposition of the proceeding on its merits, makes unnecessary a discussion and determination of a procedural question raised by petitioner.

For the reasons above stated it is ordered that this proceeding against petitioner be, and it is, dismissed.