[L.A. No. 30120. In Bank. Mar. 1, 1974.]

MELVIN M. BELLI, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

826

## COUNSEL

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Thomas Kallay and Herman F. Selvin for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—We review here a recommendation by the State Bar's Disciplinary Board that petitioner Melvin Belli be suspended from the practice of law in the State of California for one year. Mr. Belli stands accused of wilful violations of rule 2, section a, of the Rules of Professional Conduct, which declares, in part, that "[a] member of the State Bar shall not solicit professional employment by advertisement or otherwise."[1] The board deter-

---

[1]The remainder of rule 2, section a, reads: "Without limiting the generality of the foregoing a member of the State Bar shall not solicit professional employment by (1) Volunteering counsel or advice except where ties of blood relationship or trust

mined that Belli violated this proscription primarily through the acts of an agent, one Richard Fulton.

Petitioner Belli gained entrance to the California Bar in 1933 and since has achieved a considerable reputation as a trial attorney. He has simultaneously pursued careers as a public speaker and author. For more than 30 years, he has lectured before lay and professional audiences on topics ranging from law and legal reform to religion, astrology, and J. Edgar Hoover. He also has conducted for over 20 years the so-called "Belli Seminars," consisting of panel discussions held before lawyers and lay people between practicing attorneys primarily about recent developments in the law.

Belli originally did not demand compensation for these efforts, but reversed this pattern several years ago and apparently now receives handsome stipends. A critical event in this reversal was his signing of a series of contracts with Richard Fulton of Richard Fulton Incorporated. Fulton runs a lecture bureau which brings together parties interested in lecturing for profit and parties interested in hiring lecturers. He contracts with all varieties of celebrities, obligating himself to use best efforts to procure for them lecture engagements in return for a percentage of the fees paid the celebrities.

On October 20, 1966, Belli and Fulton entered the first of three successive written contracts, all identical, save that each covered a different time period. The agreements declared that Fulton was to be Belli's exclusive manager and representative in the "Lecture-Personal Appearance-Spoken Word Industry in the United States and Canada," that he was to serve as Belli's "attorney-in-fact" to execute contracts for the personal services of Belli covered by their agreements, and that he was to use best efforts in "furthering the career of LECTURER and . . . in assisting LECTURER in procuring employment."

During the terms of these agreements, Fulton solicited and procured for Belli a number of lecture dates; he also solicited publicity for the Belli Seminars, and he claims to have arranged television and radio talk-show appearances for his client. Additionally, Fulton arranged for advertisements promoting a brand of Scotch whiskey that appeared in the New York Times and New York Magazine displaying Belli's name and photograph

make it appropriate. (2) Using a newspaper, magazine, radio, television, books, circulars, pamphlets, or any medium of communication, whether or not for compensation, to advertise the name of the lawyer or his law firm or the fact that he is a member of the State Bar or the bar of any jurisdiction; nothing herein shall be deemed to prevent the publication in a customary and appropriate manner of articles, books, treatises or other writing."

and setting forth the attorney's endorsement of the brand. Belli himself, during this period, displayed or caused to be displayed posters and flyers describing the Belli Seminars and announcing their times and locations.

Primarily because of the acts of Belli's agent but also due to his own activities with respect to the posters and flyers, the State Bar on its own motion initiated disciplinary proceedings against Belli before one of the bar's local administrative committees. That body determined after a hearing that Belli had violated his oath as an attorney (see Bus. & Prof. Code, §§ 6067, 6068, and 6103) by disobeying rule 2 of the Rules of Professional Conduct and concluded that Belli should be suspended from the practice of law in California for one year. The committee recommended, however, that the sentence be suspended for three years subject to several conditions. The bar's disciplinary board affirmed the committee's judgment save that it recommended that the one-year suspension be unconditional. The board adopted 14 findings of fact, several of which are critical to the present proceeding. We review, below, each of these critical findings and the legal conclusions drawn therefrom.

Before doing so, however, we set forth the appropriate standard of review. ■ We consistently have held that although the findings of a local administrative committee and the disciplinary board deserve considerable weight, they do not bind us; we must weigh the evidence, pass upon its sufficiency, and draw the appropriate legal conclusions. ■ Although the burden rests upon petitioner to convince us that the findings are not supported by the evidence and that the charges of proscribed conduct have not been proved to a reasonable certainty, close questions must be resolved in his favor. (*Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 133 [77 Cal.Rptr. 233, 453 P.2d 737]; *Steiner* v. *State Bar* (1968) 68 Cal.2d 707, 708-709 [68 Cal.Rptr. 729, 441 P.2d 289]; *Most* v. *State Bar* (1967) 67 Cal.2d 589, 596 [63 Cal.Rptr. 265, 432 P.2d 953]; *Zitny* v. *State Bar* (1966) 64 Cal. 2d 787, 789-790 [51 Cal.Rptr. 825, 415 P.2d 521].)

### 1. *Brochures distributed by Fulton.*

The disciplinary board rightly found that Fulton distributed thousands of brochures in the United States and Canada. Recipients of the brochures were parties and institutions likely to be interested in hiring lecturers, primarily colleges, universities, and religious and charitable organizations. The brochures were entitled, "America's Finest Lecture-Entertainment Bureau —Richard Fulton, Inc." Each of their more than 30 pages contained small photographs and brief descriptions of five celebrity-lecturers under contract with Fulton; a random list includes Rudolph Bing, Joyce Brothers, Whitey

Ford, Gerald Ford, Daniel Inouye, Seymour Lipset, Floyd McKissick, Corbett Monica, and Mike Wallace. Petitioner's photograph appeared in the brochures accompanied by the following biographic paragraph: "World famed attorney who served Jack Ruby in that capacity. Author of 'Ready For the Plaintiff,' 'Life and Law in Russia,' and 'Dallas Justice' is currently preparing 'The Law Revolution—With Due Process—the 100 Cases.' Host of ABC's 'The Wide World of Melvin M. Belli.' Conducts 'The Belli Seminars' nationally."

The disciplinary board concluded that the creation and distribution of these pamphlets lay within the scope of the agency established by the Belli-Fulton contract then in effect. We agree. The contract explicitly *required* Fulton to "[further] the career of LECTURER" and "[assist] LECTURER in procuring employment"; moreover, Fulton was granted the "right to use . . . the name, photograph, likeness and biography of LECTURER for informative purposes and to publicize and advertise LECTURER." This language indisputably encompasses the activities in question; indeed, if Fulton had not disseminated the brochures or done something substantially similar, he might have been liable for breach.

Nor is there basis for concluding that Belli restricted the scope of the agency subsequent to his signing this contract.[2] He declared before the bar's local administrative committee that when presented with a sample pamphlet prior to Fulton's commencement of mass distribution, he voiced objection to the pamphlet's reference to Belli's representation of Jack Ruby.[3] He did not object, however, to the distribution of the pamphlet nor did he request that it not again be published in the same form.

We agree, then, with the board's finding that Fulton distributed publicity pamphlets which included a picture and biographic sketch of petitioner and that Fulton's doing so fell within the ambit of his agency. We disagree, however, with the board's conclusion that these actions are proscribed and proscribable. Significant, in this regard, is .the fact that the board made

---

[2] The Belli-Fulton contracts provided that they could not be modified orally and stipulated that they should be interpreted pursuant to the laws of New York State. These provisions appear irrelevant to the present controversy, however, since presumably they apply only to contractual disputes between Belli and Fulton. If Belli had unequivocally and unilaterally instructed Fulton to rewrite or omit the description of Belli from the brochures, this act should have been sufficient to insulate Belli from punishment by the bar for Fulton's subsequent distribution of the brochures. Whether Belli would then have been vulnerable to a suit by Fulton based on breach of contract is a separate question.

[3] Belli concedes that he did not object for fear of overstepping ethical bounds, but because he felt that the reference to Ruby was in bad taste. The appropriate focus for our agency analysis, however, is Belli's objective behavior, not his motives.

no finding that petitioner Belli said or did anything at his lectures which constituted prohibited solicitation of legal business. Given the absence of such a finding, we assume that Belli's discussion of legal and nonlegal topics at these events was protected by the First and Fourteenth Amendments. To be sure, the bar seeks to suspend Belli for acts which served to procure lecture dates, not for the content of his lectures themselves. If deprived of the ability to arrange speaking engagements, however, petitioner's First Amendment right to lecture would be effectively frustrated; he could still speak, of course, before an empty house, but such a right would be more a hollow shell than a meaningful constitutional entitlement. (Cf. *Van Nuys Pub. Co.* v. *City of Thousand Oaks* (1971) 5 Cal.3d 817, 821 [97 Cal.Rptr. 777, 489 P.2d 809]; *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276, 284 [29 Cal.Rptr. 1, 379 P.2d 481].)

The State Bar has pressed the argument that First Amendment interests play no part in this controversy. Citing *Valentine* v. *Chrestensen* (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct. 920] and its progeny, the bar notes that although the federal Constitution prohibits states from unduly burdening or constricting speech, the United States Supreme Court has declared that the "Constitution imposes no such restraint on government as respects purely commercial advertising." (*Valentine* v. *Chrestensen, supra,* at p. 54 [86 L.Ed. at p. 1265].) *Valentine,* however, concerned an individual who sought to distribute handbills promoting his public exhibition of a submarine;[4] petitioner, by contrast, sought to discuss serious and oftentimes controversial issues of public significance.[5] *Valentine* therefore appears

---

[4]The party exhibiting the submarine had shrewdly placed on the backs of his handbills a statement protesting the fact that New York City had refused to let him dock the vessel near a certain city park; he apparently hoped that this "political" message would trigger constitutional protections and insulate him from a city regulation prohibiting his distribution of the handbills in that same park. The Supreme Court dismissed this joinder of commercial and political messages as an intentional evasion, thus at least suggesting that if the handbill distributor's intentions had been otherwise, a different result might have followed. (See *Jamison* v. *Texas* (1943) 318 U.S. 413 [87 L.Ed. 869, 63 S.Ct. 669].)

[5]The character of Belli's actions and that of the handbill distributor's in *Valentine* are *not* rendered similar by the fact that both individuals were compensated for the activity they advertised. When, for example, an author writes, promotes, or distributes a book, his actions are not drawn outside the scope of First Amendment balancing merely because he seeks profit for his efforts; the Amendment does not require an author or speaker to starve. "Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 111 [87 L.Ed. 1292, 1297, 63 S.Ct. 870, 874, 146 A.L.R. 81]. See also *Pittsburgh Press Co.* v. *Human Rel. Comm'n* (1973) 413 U.S. 376, 384-385 [37 L.Ed.2d 669, 676-677, 93 S.Ct. 553]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Smith* v. *California* (1959) 361 U.S. 147, 150 [4 L.Ed.2d 205, 209, 80 S.Ct. 215]; Note, *Freedom of Expression in a Commercial Context* (1965) 78

inapposite because of the different characters of the activities promoted. When the activity advertised triggers First Amendment considerations, the advertising itself should do so also. The activity advertised in *Valentine* was not such a trigger.

Cases decided by the United States Supreme Court since *Valentine* appear to bear out this distinction between the promotion of commercial as opposed to First Amendment activities. In *Martin* v. *Struthers* (1943) 319 U.S. 141 [87 L.Ed. 1313, 63 S.Ct. 862], the court, on First Amendment grounds, held that a party distributing flyers announcing a religious gathering could not be kept from doing so under a blanket ordinance prohibiting door-to-door distribution of advertisements; the court noted that the ordinance affected more than just "commercial advertising." (*Martin* v. *Struthers, supra,* at p. 142, fn. 1 [87 L.Ed. at p. 1316.)[6] In *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105 [87 L.Ed. 1292, 63 S.Ct. 870, 146 A.L.R. 81], the court invalidated license fees imposed upon parties distributing religious literature for money donations and not shown to cover only reasonable costs of supervision. And in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the court held the *Valentine* doctrine inapplicable to an advertisement that transcended the merely commercial by conveying a message of public concern. (*New York Times Co.* v. *Sullivan, supra,* at pp. 265-266 [11 L.Ed.2d at pp. 697-698].)

We conclude, therefore, that the State Bar's effort to suspend Belli for soliciting lecture engagements necessarily imports considerations of constitutionally protected free speech. We do not mean to suggest, of course, that Belli and others should be permitted to use such solicitation as a subterfuge for soliciting legal business. ▮ Our conclusion does dictate, however, that the bar may not abridge fundamental constitutional rights. Such is the teaching of cases like *Mine Workers* v. *Illinois State Bar Assn.* (1967) 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353]; *Railroad Trainmen*

Harv.L.Rev. 1191, 1203.) When *Valentine* announced that the First Amendment imposes no restrictions on government with respect to "purely commercial advertising," it thus must have been adverting to the nature of the activity advertised, not the fact that the advertiser received compensation for that activity. Most goods and services must therefore be distinguished from those few which trigger First Amendment considerations.

[6]The court retreated from its position in *Martin* somewhat when in *Breard* v. *Alexandria* (1951) 341 U.S. 622 [95 L.Ed. 1233, 71 S.Ct. 920, 35 A.L.R.2d 335], it upheld ordinances forbidding door-to-door solicitation without homeowner consent even though the solicitors sought magazine subscriptions. *Breard* did not purport to ignore First Amendment considerations as did *Valentine,* however, but appears merely to have weighed the First Amendment and opposing interests differently than did the *Valentine* court.

v. *Virginia Bar* (1964) 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct. 1113, 11 A.L.R.3d 1196]; and *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415 [9 L.Ed. 2d 405, 83 S.Ct. 328].

We leave the bar's solicitation rule free to operate in areas not affecting constitutionally protected speech. We hold, however, that when the bar seeks to discipline an attorney for a communication incident to protected speech, in addition to showing that the attorney intended by his communication to generate business for his law practice (see Bus. & Prof. Code, § 6077; *Millsberg* v. *State Bar* (1971) 6 Cal.3d 65, 74 [98 Cal.Rptr. 223, 490 P.2d 543]), it must demonstrate that the communication or a part thereof was *principally directed* toward this end. We build into this construction of rule 2 a belief that the speech interest prevails over the desire of the bar to minimize solicitation of legal business[7] both because the former is anchored in the federal Constitution and because it is properly accorded a fundamental position within that document.

Applying this standard, we find it patent that the distribution by Fulton of brochures to those likely to engage lecturers does not, through imputation, constitute a violation of rule 2 by petitioner. An opposite conclusion would require one of two showings: (1) that the material about Belli in the pamphlets was principally directed at persuading the parties receiving it—officers, secretaries, and others reading the mail at the institutions to which it was sent—to hire petitioner in his capacity as an attorney, or (2) that the Belli material in the pamphlets was principally directed at generating lecture dates so that Belli could then procure clients from the lecture audiences.

With respect to the first of these alternatives, we find it extremely difficult to imagine that a party primarily interested in soliciting legal business would do so by inserting a photograph and one paragraph biography of himself into a brochure containing similar materials about more than 100 other individuals and intended for a narrow group in the population whose members had in common a propensity for hiring lecturers. The entire focus

---

[7] Bar associations have advanced a variety of rationales for the solicitation proscription. Included are the notions that solicitation would besmirch the reputation of lawyers and the law, "stir up" litigation including much that was fraudulent, often misrepresent lawyers' abilities, and facilitate corruption of public officials. There recently has been substantial commentary to the effect that the solicitation rule, at least in its broadest form, is not needed to achieve its claimed purposes or is undesirable for other reasons. (See *A Critical Analysis of Rules Against Solicitation by Lawyers* (1958) 25 U.Chi.L.Rev. 674; *Controlling Lawyers by Bar Associations and Courts* (1970) 5 Harv.Civ.Rights-Civ.Lib.L.Rev. 301, 348-376; *A Critical Analysis of Bar Association Minimum Fee Schedules* (1972) 85 Harv.L.Rev. 971, 988-992.)

of the brochures was the procurement of lecture dates; nothing in the record suggests otherwise. And petitioner pursues, after all, a lucrative career as a public speaker; he also asserts that he is motivated by a desire to serve a publicly utile function. These alternative motivational foci furnish ample basis for the conclusion that the Belli material in the brochures was not primarily directed toward the solicitation of clients from among the brochures' addressees.[8]

Nor can we find grounds for concluding that the second alternative is true, that the Belli material in the brochures was principally directed at generating forums for procuring legal business. As mentioned, the disciplinary board did not find, nor does the record suggest, that petitioner behaved improperly at his lectures. At most, the record supports the conclusion that the parties introducing petitioner at the lectures told members of the audience that petitioner was a well-known and respected attorney. That hardly seems surprising; indeed, it is hard to imagine that many people came to the lectures unaware of Belli's reputation. And more importantly, even assuming these introductory remarks could be imputed to Belli, were we to rule that they can be a basis for punishment, many attorneys might refrain from participating in public forums, a result which is hardly acceptable.[9] (See *Millsberg* v. *State Bar* (1971) 6 Cal.3d 65, 75-77 [98 Cal.Rptr. 223, 490 P.2d 543] (Mosk, J., dissenting).)

### 2. *Fulton's efforts to obtain radio and television appearances for Belli.*

A second basis for the disciplinary board's sanction recommendation is its finding that agent Fulton sought radio and television appearances for petitioner. Fulton testified that when Belli planned to travel, Fulton frequently arranged talk-show engagements for Belli in the area toward which Belli was headed. Correspondence in the record substantiates this testimony.

Belli acknowledges these activities but claims they were beyond the scope of Fulton's authority. The attorney testified, however, that although aware of Fulton's media activities, he never lodged protests about them. More-

---

[8]Entirely consistent with this conclusion is the presence in the biographic paragraph of language attesting to the fame and accomplishments of petitioner. Such statements served the function of informing brochure recipients of the fame and expertise of petitioner and therefore increased the chances that they would hire him.

[9]A major rationale advanced to support the solicitation proscription is that solicitation tarnishes the reputation of the bar. (See fn. 7, *supra; Mayer* v. *State Bar* (1934) 2 Cal.2d 71, 74 [39 P.2d 206].) To the extent the bar is regarded highly, it probably is so because countless attorneys have taken active roles in discussing and resolving significant social problems. Were rule 2 applied in a manner which chilled such participation, the result might be that the rule *harmed* rather than enhanced the bar's reputation.

over, the Belli-Fulton contracts declared Fulton to be Belli's "personal representative in all branches of the Lecture-Personal Appearance-Spoken Word Industry," broad phraseology indeed which would appear to encompass the activities in question. We conclude, therefore, that the board was justified in judging Fulton's work to be within the bounds of his agency.

■ This imputed behavior cannot constitute a basis for rule 2 punishment, however. We recognize, to be sure, that the rule explicitly proscribes "using [radio and television] to advertise the name of the lawyer or his law firm or the fact that he is a member of the [bar]" as a means to "solicit professional employment." This language does· not, however, nor could it constitutionally, keep attorneys off the media altogether. The bar need have demonstrated that petitioner solicited business for his law practice on the media themselves. Mere public exposure is not sufficient.

The record before us indicates only that petitioner's agent arranged media engagements for his principal; the bar presented absolutely no evidence bearing on petitioner's behavior during these appearances. In the absence of such evidence and particularly because petitioner's radio and television activities very likely included constitutionally protected conduct, we do not deem Fulton's media efforts to be an acceptable basis for discipline.

3. *Display and dissemination by Belli of posters and flyers publicizing the Belli Seminars.*

■ The disciplinary board also found that petitioner displayed and disseminated or caused to be displayed and disseminated posters and flyers for the purpose of publicizing the Belli Seminars. The board found objectionable the fact that the materials mentioned Belli's name several times and seemed to imply that Belli was a prominent attorney.[10]

---

[10]Spaced aesthetically and printed in a variety of type sizes, a typical poster read, with minor omissions, as follows: "The Belli Foundation Presents—The Famed 22nd Annual Belli Seminar—Hilton Hotel—Portland, Oregon—Attended and Staffed by America's Outstanding Trial Lawyers—Friday, July 30 . . . to . . . Sunday, August 1, 1971. . . . The Belli Seminar is the outstanding seminar on trial and substantive law, civil, criminal and military. It was the first of the 'seminars' and is the best attended, by doctors and laymen, as well as lawyers. It remains the most comprehensive in American Law today. Melvin Belli and a star panel will personally review more than two decades of the dynamic growth of the law, what the law is and what it will be! The 'Liveliest Cases'—The Landmark Decisions and Forecasts of Trends. [There follows a list of 29 legal subjects.] Lawyers $20, Students $10, for the entire course. . . ."

The flyers appeared under Belli's law firm's letterhead. Signed at the bottom by petitioner, the text of the flyers read as follows: "We're doing the Annual BELLI SEMINAR in Portland, Oregon July 30-August 1, inclusive, Friday through Sunday to the opening of the American Trial Lawyers 25th Annual Convention.

"Again we'll have aboard the top trial lawyers in America, civil and criminal, (and

No serious agency issue emerges from this activity; petitioner indisputably is legally responsible for these events. We reject again, however, the conclusion that the activity is prohibited. The seminars, we have every reason to believe, are constitutionally protected. Publicity directed at building audiences for the seminars therefore also deserves protection if the publicity as a whole and all parts thereof are not primarily a subterfuge to build business for petitioner's law practice.

Applying, again, the standard we have enunciated for judging the propriety of communications which trigger First Amendment considerations, we conclude that the bar has fallen short of demonstrating petitioner's poster and flyer activities to be an acceptable basis for discipline. The clearly dominant thrust of the posters and flyers was to disseminate information about the Belli Seminars and enlarge seminar audiences; their *entire* contents were devoted to describing the program and furnishing time, place, and similar data.

The repeated appearances of Belli's name in these materials are not inconsistent with this thrust. Belli is well-known, and references to him were probably thought helpful in generating special interest in the seminars. Nor does the suggestion in the materials that Belli is a prominent attorney undercut our conclusion. The suggestion appears only in the posters and there only obliquely.[11] As a means to communicate the expertise of the party conducting the programs, it is entirely consonant with our conclusion that Belli sought primarily to promote his seminars. And there has been no demonstration that Belli used the seminars themselves as vehicles to generate business for his law practice.

---

we hope you) and we'll be discussing not only what the law was, way back when, but what it is now and, more importantly to you in the 70's, what it will be!

"The Seminar was and is the first of its kind, the most copied and imitated, and if we do say so ourselves, the most educational and informative and interesting one in American law today!

"Do come again this time as an auditor or as a participant or just send in a question or a note or suggestion, or citation, but don't ignore the Belli Seminar—you can't afford to because the lawyers who are really with the action in the law today have followed these seminars through the last 22 years.

"Try to be with us and if you want to do a paper or participate or such, drop us a note immediately, please."

[11]The posters contained the statement, "Melvin Belli and a star panel will personally review more than two decades of the dynamic growth of the law," suggesting perhaps that Belli is a "star" himself. The posters also proclaimed that the seminars are attended and staffed by "America's Outstanding Trial Lawyers." The flyers, on the other hand, seem to contain no laudation of Belli, save unless the statement, "we'll have aboard the top trial lawyers in America" in a document signed at the bottom by Belli is tortuously read to refer in part to its asserted author.

4. *Letters sent by Fulton announcing the twentieth anniversary of the Belli Seminars.*

A fourth basis for the disciplinary board's sanction recommendation is a trio of letters sent by Fulton in July of 1969, one each to individuals at Time and Newsweek magazines and the New York Times, announcing that petitioner was then about to celebrate the twentieth anniversary of the Belli Seminars. Clearly not intended for publication, the letters spoke of Belli as a "brilliant attorney" and the "King of Torts," described the seminars as "historic events in the world of jurisprudence," and enumerated a list of personalities including clients of petitioner who were expected to attend the celebration and pay tribute to Belli. The addressees were informed that they could communicate with Belli or Fulton's office "for additional information regarding this most newsworthy event."[12] The disciplinary board found that these letters fell within the scope of Fulton's agency and that through imputation, Belli had consequently solicited professional employment.

The board's agency finding appears substantially supported by the evidence. As mentioned, the written contract declared Fulton to be Belli's "personal representative in all branches of the Lecture-Personal Appearance-Spoken Word Industry," phraseology which would appear to embrace Belli's seminar activity. Furthermore, even if this language is interpreted otherwise, Fulton believes that he sent Belli copies of the anniversary letters either before or after he mailed the originals and that petitioner failed to register a protest. Although Belli asserts that he did protest and that Fulton had no authority to publicize the seminars, it was within the province of the board to resolve this evidentiary conflict against petitioner and determine that Belli had redefined the agency so as to include seminar publicity.

---

[12]The full text of the letters read as follows: "Mr. Melvin Belli, the brilliant attorney, author and lecturer will be celebrating the 20th Anniversary of his annual Belli Seminar on July 26, 27, 1969 at the Brown Palace Hotel, Denver, Colorado.

"These seminars are attended annually by the worlds [*sic*] foremost attorneys who come to 'sit at the feet' of 'The King of Torts' for purely academic reasons.

"This year being the 20th of such historic events in the world of jurisprudence there will be a testimonial aspect as well as the seminar.

"Expected to attend and pay tribute to Mr. Belli are the following personalities most of whom are either clients of Mr. Belli or dear personal friends: Mayor Joseph Alioto, Mike Douglas, Drew Pearson, Earl Wilson, Robert Goulet, Mayor Sam Yorty, Dick Gregory, Otto Preminger, Sidney Poitier, Bob Considine, Alex Haley, Earle Stanley Gardner, Raymond Burr, Richard Fulton, Sammy Davis, Jr., Burt Lancaster, F. Lee Bailey, Tony Curtis, Hon. Orville J. Freeman, among others.

"Please feel free to communicate with Mr. Belli's office . . . or my office . . . for additional information regarding this most newsworthy event."

We concur, moreover, with the board's conclusion that the letters are proscribed and proscribable. To be sure, they were not directed at securing clients from among the three persons to whom they were addressed; they were intended, instead, to cause the addressee publications to print notices of the seminars' anniversary. Because the seminars almost certainly merit First Amendment solicitude, the bar need have demonstrated, therefore, that the letters or parts thereof were principally directed at building Belli's law practice.

Since it appears clear that the letters were intended to cause the addressee publications to print pieces containing the substantive content of the letters, we look to that content in order to evaluate the letters' propriety. We are convinced that the correspondence was primarily directed at generating seminar publicity rather than legal business; indeed, the letters probably would not have been written if that objective had not been contemplated. Contained in the letters, however, is language which we conclude was primarily directed at expanding Belli's law practice.[13] After praising Belli's lawyering talents, the letters announced, as mentioned, that various enumerated personalities including *clients* were expected to pay tribute to petitioner.

Exposition of an attorney's accomplishments in an effort to interest persons in attending a constitutionally protected communication, is one thing;[14] suggesting, in the process, that because dazzled by the services they have received from the attorney, clients intend to attend in order to pay tribute to the attorney is quite another. Such a suggestion, not necessary to generate audiences for protected expression, falls beyond the scope of protected solicitation of audiences. Rather, the language describing the anticipated encomium to Belli appears primarily directed at soliciting legal business. It suggests that one who becomes a client of Belli will be so satisfied that he will attend the Belli Seminars' anniversary celebration to honor Belli. An attorney, in our opinion, cannot advertise that he has performed his services so well that his clients consequently praise him. We could not sanction an advertisement in a newspaper, for example, that proclaimed: "Mr. X is an attorney whose clients are so well satisfied with the services they receive that they later come to pay tribute to him." Such an advertisement is proscribed by rule 2.

---

[13]We recognize, of course, that Fulton, author of the letters, did not stand to profit directly by any expansion of petitioner's legal practice; it is unlikely, therefore, that he intended with this language to achieve such an expansion in the sense that he particularly desired the expansion. The language, however, we believe can be said to have been "primarily directed" at soliciting law business in the sense that such solicitation could have been anticipated as the language's primary, probable function.

[14]See pages 834, footnote 8, 836-837, *supra.*

### 5. *Scotch ads arranged by Fulton.*

A final basis for the board's discipline recommendation is an advertisement which appeared twice in the New York Times and once in New York Magazine promoting Glenfiddich Scotch. The heading of the ad announced in large type that "Melvin Belli is onto unabridged Scotch"; readers were then informed in smaller print that "[t]his isn't the first time [Belli] knew something others didn't know." There followed a small photograph of petitioner and an introductory paragraph which read: "Melvin Belli is the famous trial lawyer who first employed 'modern demonstrative evidence' in the courtroom. Rather than simply stating his case, he demonstrates it so conclusively that the case is won almost at once." The bulk of the ad then followed and consisted of presumably devastating questioning by Belli of a "conventional Scotch drinker" who ultimately came to recognize the inevitable truth that Glenfiddich is a superior beverage. The ad series was arranged for entirely by Fulton and undisputably without Belli's knowledge; the State Bar thus once again had to demonstrate that Fulton's actions fell within the scope of his agency.

We conclude that its efforts fall short with respect to the first two of the ad's three appearances, one in the New York Times on February 24, 1970, and another in New York Magazine on March 2, 1970. The written contract between Belli and Fulton prescribed that "LECTURER grants to FULTON the right to use and to license others to use the name, photograph, likeness and biography of LECTURER for informative purposes and to publicize and advertise LECTURER and LECTURER's engagements." It further declared that "[s]uch use may be in combination with advertising of products or services *of any employer of* LECTURER, *but shall not amount to an endorsement thereof by* LECTURER." (Italics added.) Neither Glenfiddich nor its advertising agency was an employer of Belli qua lecturer, and the language quoted appears confined to publicity involving Belli's employment in that capacity alone. The agreement furthermore excludes product endorsements of which the Scotch ad certainly is an example. Thus, absent appropriate data extrinsic to the documents, there is no basis for inferring an agency.

No such data exist with respect to the initial two appearances of the ad. The record is devoid of evidence that Fulton, with Belli's permission, had undertaken previous to those appearances publicity projects even vaguely similar to the Glenfiddich promotion such that Fulton could reasonably infer that he had the authority to arrange for the advertising.[15] Nor did Belli explicitly authorize the advertising or know Fulton was arranging it.

---

[15]Nor is there evidence that Fulton did so without petitioner's permission.

He in fact was traveling in Africa and elsewhere abroad when Fulton contracted with the ad agency and did not return until after the ad had been printed once in each of the publications mentioned. Given these facts, we can infer no agency. (See *Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 139 [77 Cal.Rptr. 233, 453 P.2d 737]; *Burke* v. *State Bar* (1933) 218 Cal. 143, 146 [21 P.2d 577].)

The situation is different, however, with respect to the third appearance of the ad, this one in the New York Times on March 31, 1970. Petitioner by that time had returned to the United States. He had sent Fulton a letter dated March 23 in which he had blithesomely described his travel adventures but had mentioned nothing about the Glenfiddich ad. Evidence in the record supports the conclusion that Belli had seen copies of the ad after it twice had been printed but before he sent this letter. Moreover, petitioner had every reason to believe that Fulton was responsible for the ads, and, as an attentive participant in our media-oriented culture, he doubtless was aware that advertisements frequently appear repeatedly as part of the ad industry's efforts to drum home its propaganda. Following Belli's letter of the 23d, Fulton thus reasonably could have inferred—and Belli should have known Fulton reasonably could have inferred—that Fulton had the authority to let the advertisement appear a third time. The board justifiably concluded, therefore, that the final appearance of the ad fell within the bounds of Fulton's agency.[16]

■ It remains, then, to determine whether that final printing constituted proscribed solicitation of legal business. Critical is the fact that the ad did not promote an activity worthy of First Amendment solicitude. Whereas lectures and seminars clearly fall near the core of protected speech, liquor sales are similar to the submarine exhibition in *Valentine*; they are exclusively "commercial" phenomena not deserving of special constitutional deference. The State Bar accordingly need not have shown that the last printing of the ad was principally directed toward procuring business for petitioner's law office; mere wilfulness, either a desire to solicit business or a substantial certainty that the ad would generate business, is the only state of mind the bar need have demonstrated. (See Bus. & Prof. Code, § 6077; *Palmquist* v. *State Bar* (1954) 43 Cal.2d 428, 435-436 [274 P.2d 640].)

Petitioner's possible purposes in letting appear an ad extolling his virtues as an attorney could be many: procurement of clients, compensation for the

---

[16]Belli ultimately ordered the ad campaign stopped, but only after its March 31 printing and apparently not until the State Bar had expressed its displeasure with the ad.

ad itself,[17] general publicity for the purpose of building book sales and lecture audiences, or simply a desire to see his name and picture in print.[18] Precisely which motive or motives played what role we cannot say for certain; most likely a psychologist could not either. Clearly, however, had petitioner wished only to generate book sales or larger lecture audiences, he could have gone about his task in a manner much more precisely tailored to his objective; the lecture brochures and seminar flyers considered earlier are examples. Instead, he let an advertisement be printed which was unrelated to his lecture and seminar activities and which explicitly trumpeted his talents and accomplishments as an attorney. Under the circumstances, it was reasonable for the disciplinary board to infer that through the ad, petitioner sought to generate business for his law firm.

All activities similarly motivated of course are not necessarily prohibited by rule 2; certainly an attorney's efforts to provide quality legal service, in part out of a desire to attract future business, are not proscribed by the rule. The rule does, however, explicitly prohibit an attorney from using newspapers and magazines for the purpose of advertising himself. We conclude, therefore, that the disciplinary board was justified in finding that petitioner wilfully solicited professional employment when he permitted the third printing of the Glenfiddich ad.

To summarize, we find improper as bases for disciplining petitioner Fulton's distribution of lecture brochures and his efforts to arrange media appearances for petitioner. We reach a similar conclusion with respect to the display and distribution of posters and flyers. Acceptable as a basis for disciplining petitioner, however, is the correspondence heralding the anniversary of the Belli Seminars. As for the Glenfiddich advertising, we hold that Fulton's arranging for the first two appearances of the ad was not within the scope of his agency, but that Belli is legally responsible for the third appearance of the ad and that this constitutes a second violation of rule 2.

Given our conclusion that there remain only two bases for disciplining petitioner and that these consist of vicarious behavior in which petitioner took no active role, the disciplinary board's one-year suspension

---

[17]Fulton arranged with the advertising agency for Glenfiddich to send Belli 12 cases of its Scotch as compensation for the ad. Whether Belli was aware of this after he returned from abroad and before March 31, the date of the ad's third printing, is unclear. It appears, in any event, that the Scotch had all been distributed to persons other than Belli by the time he had returned home.

[18]The principal reason the ad extolled petitioner's virtues, of course, was that Glenfiddich and its ad agency doubtless felt that such laudation could help expand Glenfiddich Scotch sales; they sought to communicate that one who had excelled in a profession requiring judgmental and discriminative skills and who had shown himself to be ahead of his time thought highly of Glenfiddich.

recommendation is patently excessive. We believe that a 30-day suspension is the appropriate sanction. It is therefore ordered that Melvin B. Belli be suspended from the practice of law in this state for a period of 30 days. The suspension shall commence 60 days after the filing of this opinion.

Wright, C. J., did not participate therein.

Richardson, J.,* participated therein.

**CLARK, J.**—I dissent.

Mr. Belli's flamboyant life style has no doubt offended many a lawyer and judge. But while the facts before us may affront our sense of professional dignity, they fail to support suspension of petitioner from the practice of law for willfully soliciting professional employment.

The majority first determines that the conduct of the lecture agent in distributing publicity pamphlets, soliciting lecture engagements and arranging radio and TV appearances does not constitute an acceptable basis for discipline because it is not *principally* or *primarily* directed toward the solicitation of clients.

Then, however, the majority decides that the conduct of the same agent, acting pursuant to the same contract in sending a press release announcing the 20th anniversary dinner of the Belli lecture series, is improper because, while "primarily directed at generating seminar publicity," it contains language "primarily directed at soliciting law business in the sense that such solicitation could have been anticipated as the language's primary, probable function." The troublesome language apparently refers to Mr. Belli's purported clients paying him tribute at his testimonial dinner in Denver.

Finally, the majority decides that the conduct of the same lecture agent in announcing "Melvin Belli is onto unabridged Glenfiddich Scotch," while not initially imputable to Mr. Belli, became chargeable to him when he failed to stop the final ad on his return from Africa. Just how a New York whiskey endorsement might enhance a California law practice goes unexplained. Reliance on *Palmquist* v. *State Bar,* 43 Cal.2d 428 [274 P.2d 640], is misplaced—the case assists Mr. Belli.

The facts of this case—forcing the majority to concede that "there remain only two bases for disciplining petitioner and that these consist of vicarious behavior in which petitioner took no active role,"—hardly support the willful violations charged in the first paragraph of the majority's lengthy opinion. Worse, the opinion casts grave doubt on the propriety of *any* com-

*Assigned by the Chairman of the Judicial Council.

mercial or testimonial use of a lawyer's name, absent clear constitutional protection.

I would dismiss the proceedings.

Petitioner's application for a rehearing was denied March 27, 1974. Clark, J., was of the opinion that the application should be granted.