755 N.W.2d 835 (2008)
2008 ND 162
In the Matter of the Application for DISCIPLINARY ACTION AGAINST Loren C. McCRAY, A Member of the Bar of the State of North Dakota.
Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner,
v.
Loren C. McCray, Respondent.
Nos. 20070376, 20070377.
Supreme Court of North Dakota.
September 3, 2008.
*837 Paul W. Jacobson, Disciplinary Counsel, Bismarck, N.D., for petitioner.
Michael R. Hoffman, Bismarck, N.D., for respondent.

SUSPENSION ORDERED.
PER CURIAM.
[¶ 1] Loren C. McCray and counsel for the Disciplinary Board petition this Court *838 for review of a hearing panel's report and recommendation that McCray be suspended from the practice of law for 120 days for violating the North Dakota Rules of Professional Conduct and the North Dakota Rules for Lawyer Discipline for activities related to "credit repair." We conclude there is clear and convincing evidence McCray violated N.D.R. Prof. Conduct 1.5, 4.1, 5.4, 5.5(e), 7.3(a), 8.4(c), (f), and (g), and N.D.R. Lawyer Discipl. 1.2A(3) and (8). We suspend McCray from the practice of law for six months and one day and order that he pay the costs of the disciplinary proceedings.

I
[¶ 2] McCray was admitted to practice law in North Dakota on November 7, 1994. Since then he has practiced law in Jamestown, Hebron, and Beulah, and he currently practices primarily bankruptcy law in Bismarck. In August 2004, McCray became employed by Bradley Ross Law, a California corporation owned by John T. McManus, an attorney licensed to practice law in California and Indiana. Bradley Ross Law performed credit repair services for its clients. McCray learned that Bradley Ross Law was looking for a North Dakota lawyer because Bradley Ross Law had determined North Dakota was one of the few states that allows trade names to be used for a law firm name and North Dakota has no credit repair organizations act. McCray opened a Bismarck office for Bradley Ross Law acting as a professional corporation in North Dakota through a certificate of foreign corporation. McCray also operated his own law firm, Loren McCray, Attorney at Law, from the same address with the assistance of one employee.
[¶ 3] In January 2005, McCray became the sole shareholder and employee of Bradley Ross Law, P.C., a North Dakota professional corporation, and in October 2005, he purchased the clients and business of Bradley Ross Law from McManus. The hearing panel described the business operations of Bradley Ross Law, P.C.:
In his work for Bradley Ross Law, P.C., McCray reviews client files, speaks with clients, disputes items on clients' credit reports with credit reporting agencies, and performs related work. From August 2004 to the present, Bradley Ross Law and Bradley Ross Law, P.C. have had no other employees, except McCray, in North Dakota. During the timeframe that McCray has been associated with Bradley Ross Law and Bradley Ross Law, P.C., there have been approximately 25 to 30 employees working for the corporations as leased employees in Fishers, Indiana. The employees, along with computer services, marketing services, a processing center, and other services are leased from a service provider by the name of Bellwether, Inc., or its affiliates. Several of the leased employees in Indiana are listed as legal assistants of Bradley Ross Law, P.C. (formerly Bradley Ross Law) and perform such duties as disputing items on client credit reports, making requests directly to creditors with respect to disputed items, responding to client inquiries, and performing related duties.
[¶ 4] McCray was paid $26,000 per year when he first became employed with Bradley Ross Law in 2004. Bradley Ross Law had 18,000 clients that year, and in 2003 the firm had $8,500,000 in gross income. After McCray formed Bradley Ross Law, P.C., he began drawing $50,000 per year from the business. In 2006 McCray earned about $75,000 from the business, which had gross revenue of $10,000,000 but had a tax loss of $10,000. That year Bradley Ross Law, P.C., had approximately 9,450 clients and McCray *839 spent about one-half of his time working for the business. Of the $10,000,000 in 2006 gross revenue received by the firm, about $9,500,000 was paid to Bellwether, Inc., or its affiliates. Bellwether, Inc., is owned by Steve Snyder, who gave seminars on how to improve credit scores. During 2005, Bradley Ross Law, P.C., and other entities sponsored approximately 25 seminars conducted by Bellwether, Inc., across the country. McCray did not personally attend any of the seminars.
[¶ 5] In January 2005, Dr. Michaela McKenzie, a dentist in Georgia, received a letter from Snyder inviting her to attend a seminar about regaining credit after bankruptcy. McKenzie, who had recently been through bankruptcy, decided to attend. The hearing panel described what occurred at the seminar:
Dr. McKenzie attended a seminar at a hotel in Atlanta, Georgia on February 26, 2005. Snyder presented this seminar to 400 to 500 people. Snyder explained that he was able to improve his credit score, after his own bankruptcy, by use of an attorney and explained how the attendees at the seminar could also improve their credit scores by use of an attorney who would write letters on their behalf. Snyder told the audience that they could, if they wanted to, use the law firm of Bradley Ross Law.
At the close of the seminar, Snyder invited people to sign up with Bradley Ross Law if they were interested in having their credit scores improved. Many of the attendees went through a hallway to another room where there was a bank of tables with approximately four people sitting behind them from Bradley Ross Law, P.C. Approximately 200 people from the seminar got in line to visit with the representatives of Bradley Ross Law, P.C. No other law firms were in attendance.
When Dr. McKenzie talked with a representative of Bradley Ross Law, P.C. on February 26, 2005, she was asked to sign a contract if she was interested in having Bradley Ross Law, P.C. assist her. She was advised that the standard charge was $79 per month, but if she signed up at the seminar, the cost would be $59 per month. Dr. McKenzie signed the contract. The contract stated that "[y]ou acknowledge that you intentionally sought out Bradley Ross Law in the State of North Dakota to perform legal services under federal law only in North Dakota." The contract also stated that the dispute letters that were created on behalf of a client by Bradley Ross Law were proprietary and were not kept in the client file. The client agreed to "waive any right to receive copies of letters created on my behalf." Dr. McKenzie skimmed the contract before signing it. In a letter dated May 13, 2005, Dr. McKenzie was advised that as a client on retainer, she was being charged $59 per month no matter how much work Bradley Ross Law, P.C. did for her.
[¶ 6] The contract McKenzie signed with Bradley Ross Law, P.C., also contained the following provision:
ITEMS TO BE APPEALED. If there are items on my credit reports I know to be accurate and verifiable, and do not want challenged, I will attach a separate list of these items at the inception of the agreement. Otherwise, I direct the law firm to dispute all negative credit listings, for I believe them to be inaccurate, outdated, or unverifiable.
McKenzie "skimmed" this provision before signing the contract, but "didn't really have any feeling about that paragraph." The representatives at the seminar and Bradley Ross Law, P.C., during the presentation did not ask McKenzie to submit a *840 list of non-disputed items which appeared on her credit reports. McKenzie sent Bradley Ross Law, P.C., a list of debts that had been listed in her bankruptcy pleadings, but she did not dispute any of those obligations.
[¶ 7] McKenzie eventually became concerned about the letters Bradley Ross Law, P.C., was sending to credit reporting agencies on her behalf and requested copies of the letters from the firm. On January 13, 2006, Bradley Ross Law, P.C., sent McKenzie copies of three March 2005 dispute letters it had sent to credit reporting agencies. Each letter had McKenzie's name typewritten in the writer's signature block, but no written signature appears and Bradley Ross Law, P.C., is not identified in any of the letters. A March 29, 2005, letter to Trans Union stated, "Can you help me? I do not recognize these listings that show on my report: . . . Please remove them. Thank you." Another March 29, 2005, letter to Equifax stated:
Where do you get off trying to ruin people's lives?!? You have done more harm to me than if you had run over my dog and shot out my porch light. Get these off my report. I've never even seen these accounts before.
A letter to Experian also dated March 29, 2005, stated:
It is sad when a huge company such as yours makes such awful mistakes that they injure the common people, such as myself. Where did you get this information? These are the issues I'm talking about.
. . . .
These do not look like anything I'd dealt with. I am a peaceful person who leads a very calm life and I don't like this type of upheaval. So please get rid of them so I have one less worry on my mind.
[¶ 8] The information contained in the letters was not factual and McKenzie was "absolutely horrified" when she saw the letters. McKenzie thought she was paying for letters to credit reporting agencies written by attorneys on Bradley Ross Law, P.C., letterhead. She did not deny that the accounts mentioned in the letters were accurate. Furthermore, McKenzie, who has a doctorate degree, was upset that the letters purportedly sent by her contained misspellings and poor grammar. Although the record does not indicate that McCray made a knowing decision about which form letters to send on McKenzie's behalf, the hearing panel found "McCray knowingly authorized the use of form letters which contained false information in that the letters were purportedly written and mailed by the client, contained inaccurate information about the client, and claimed that the client did not recognize the accounts on the credit report."
[¶ 9] Bradley Ross Law, P.C., wrote similar dispute letters on McKenzie's behalf to Equifax, Experian, and Trans Union in June and September 2005. McKenzie made ten monthly payments of $59 through a credit card to Bradley Ross Law, P.C., before terminating the relationship on February 8, 2006. The hearing panel found:
During the time period that McCray has been an employee of Bradley Ross Law and Bradley Ross Law, P.C., 100 or more dispute letters on behalf of clients have been sent out per day from the firm's leased facility at Fishers, Indiana. When a dispute letter is sent to the credit reporting agency, a creditor has 30 days to respond. Generally, if the creditor doesn't respond within 30 days, the disputed item will be deleted from the client's account. Many clients of Bradley Ross Law, P.C. benefit from the fact that creditors do not respond within *841 30 days and items are deleted from their credit reports.
[¶ 10] McKenzie filed a complaint with the Disciplinary Board, and these proceedings followed. After a hearing, the hearing panel found McCray violated N.D.R. Prof. Conduct 1.5 (fees), N.D.R. Prof. Conduct 4.1 (truthfulness in statements to others), N.D.R. Prof. Conduct 7.3(a) (direct contact with prospective clients), N.D.R. Prof. Conduct 8.4(c), (f), and (g) (misconduct), N.D.R. Prof. Conduct 5.5(e) (unauthorized practice of law), and N.D.R. Lawyer Discipl. 1.2A(3) and (8) (grounds for discipline). The panel found McCray had not violated N.D.R. Prof. Conduct 5.4 (professional independence of a lawyer). The panel recommended McCray be suspended from the practice of law for 120 days and pay $7,808.66 for the costs of the proceedings. McCray and Disciplinary counsel petitioned for review.
[¶ 11] The hearing panel had jurisdiction under N.D.R. Lawyer Discipl. 3.1(E). McCray and Disciplinary counsel timely filed petitions for review under N.D.R. Lawyer Discipl. 3.1(F). This Court has jurisdiction under N.D. Const. art. VI, § 3, N.D.C.C. § 27-14-02, and N.D.R. Lawyer Discipl. 3.1(F).

II
[¶ 12] "Disciplinary proceedings are reviewed by this Court de novo on the record." Disciplinary Bd. v. Buresh, 2007 ND 8, ¶ 6, 726 N.W.2d 210. Although we give due weight to the findings, conclusions, and recommendations of the hearing panel, we do not act as a mere rubber stamp. Disciplinary Bd. v. Bullis, 2006 ND 228, ¶ 12, 723 N.W.2d 667. "We give special deference to the hearing panel's findings on matters of conflicting evidence because the hearing panel had the opportunity to hear the witnesses and observe their demeanor." Disciplinary Bd. v. Johnson, 2007 ND 203, ¶ 17, 743 N.W.2d 117. Disciplinary counsel has the burden of proving each alleged disciplinary rule violation by clear and convincing evidence. Disciplinary Bd. v. Chinquist, 2006 ND 107, ¶ 7, 714 N.W.2d 469. Each disciplinary case must be considered upon its own facts to decide what discipline, if any, is warranted. Disciplinary Bd. v. McKechnie, 2003 ND 170, ¶ 7, 670 N.W.2d 864.

A
[¶ 13] McCray challenges the following hearing panel finding of fact:
The evidence established that little in the way of meaningful legal work was performed on Dr. McKenzie's behalf. Due to the volume of files handled by McCray while employed by Bradley Ross Law and the volume of files handled by McCray when employed by Bradley Ross Law, P.C., he did not have time to adequately represent the firm's clients, including Dr. McKenzie. Until recently, Bradley Ross Law, P.C. did not check to make sure that some work was done for each client for each month that the client was billed.
[¶ 14] The evidence supports this finding. McCray testified he spent between 10 and 40 hours per week working for Bradley Ross Law, P.C. Assuming for the sake of argument McCray worked 40 hours per week during the 10 months or approximately 45 weeks McKenzie was a client, he would have spent 1,800 hours servicing approximately 9,450 clients, including McKenzie. According to our calculations, this results in .19 hours, or less than 12 minutes, McCray spent working for each client during the 10-month period. We agree with the hearing panel that this is an insufficient amount of time to adequately represent McKenzie along with his other clients. Compare Jones v. North Dakota State Bd. of Med. Exam'rs, 2005 *842 ND 22, ¶¶ 20-22, 691 N.W.2d 251 (affirming finding that physician's approval of 72 prescriptions per hour over the Internet constituted a continued pattern of inappropriate care for patients).
[¶ 15] We also agree that "little in the way of meaningful legal work" was performed for McKenzie. It appears the vast majority of the work performed consisted of simply inundating credit reporting agencies with dispute letters written in the consumer's name to trigger the obligation of those agencies under the Credit Repair Organizations Act, 15 U.S.C., § 1679 et seq., to respond to all consumer disputes within 30 days and remove any legitimately challenged item that cannot be verified within the 30-day period. See Federal Trade Comm'n v. Gill, 265 F.3d 944, 952 (9th Cir.2001); 15 U.S.C. § 1681i. The persons who prepared and mailed the dispute letters were located in Indiana. Moreover, the panel's finding that Bradley Ross Law, P.C., did not until recently verify that work was performed for clients each month they were billed is supported by McCray's own testimony.
[¶ 16] We conclude the hearing panel's finding is supported by the evidence.

B
[¶ 17] McCray objects to the hearing panel's finding he violated N.D.R. Prof. Conduct 1.5(a), which prohibits a lawyer from making an agreement for, charging, or collecting "an unreasonable fee." The hearing panel found:
Dr. McKenzie was charged $59 per month for 10 months for the law firm's services and the services provided did not justify the amount she paid. Further, Bradley Ross Law, P.C. is a credit repair organization and is not operating in accordance with 15 U.S.C. § 1679b.(b) in the manner in which it collected fees from Dr. McKenzie.
McCray, through Bradley Ross Law, P.C., violated this provision by collecting between $59 and $79 per month from 9,450 to 18,000 clients regardless of how much work was done for a client, regardless if any work was done for a client, and with little or no involvement by McCray. Further, this method of billing does not meet the requirements of 15 U.S.C. 1679b.(b).
[¶ 18] A legal fee of $590 during a 10-month time span for less than 12 minutes of "legal" work that consisted primarily of mailing dispute letters in the client's own name is unreasonable. We also agree that the manner in which Bradley Ross Law, P.C., collected fees from McKenzie appears to be inconsistent with federal law. Advance payment for credit repair services is prohibited by 15 U.S.C. § 1679b(b), which provides:
No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.
This statute "prohibits acceptance of any payment before fully performing all services." Gill, 265 F.3d at 956 (emphasis in original). Bradley Ross Law, P.C., collected $59 per month from McKenzie before the services were fully performed and regardless of the amount of work the firm performed for her.
[¶ 19] We conclude there is clear and convincing evidence McCray violated N.D.R. Prof. Conduct 1.5.

C
[¶ 20] McCray objects to the hearing panel's finding that he violated N.D.R. Prof. Conduct 4.1, which provides, "[i]n the course of representing a client a lawyer *843 shall not make a statement to a third person of fact or law that the lawyer knows to be false." The hearing panel reasoned:
The letters written and sent by Bradley Ross Law, P.C. to credit reporting agencies, purportedly written by Dr. McKenzie, contained false, untrue, and misleading statements. McCray knew the form letters being used by Bradley Ross Law, P.C. were not written or sent by the firm's clients and knew that they contained false, untrue, and misleading statements.
[¶ 21] McCray contends the statements in the letter were not intended to be false, untrue, or misleading. "Knowledge may be inferred by the person's conduct in the circumstances." Disciplinary Bd. v. Johnson, 2007 ND 203, ¶ 19, 743 N.W.2d 117. The record reflects that McCray purchased the form letters from another law firm and knew what they contained. He was obviously aware the form letters were not written or sent by McKenzie and the information contained in them could not possibly be true for 9,450 clients. Although McCray may claim that only items the client wished to dispute were in fact disputed, the reasons stated in a letter sent to dispute a claim were unrelated to the basis for the dispute. For example, letters stated that the person had never seen an account before that showed up as delinquent on a credit report, when the statement was clearly false.
[¶ 22] We conclude the hearing panel's finding that McCray violated N.D.R. Prof. Conduct 4.1 is supported by clear and convincing evidence.

D
[¶ 23] McCray objects to the hearing panel's finding he violated N.D.R. Prof. Conduct 7.3, which provides:
(a) A lawyer, or the lawyer's representative, shall not by in-person or telephone contact, or other real-time contact, solicit professional employment from a prospective client when a significant motive for the solicitation is the lawyer's pecuniary gain unless the person contacted:
(1) is a lawyer; or
(2) has a family, personal, or prior professional relationship with the lawyer.
. . . .
(c) Notwithstanding the prohibitions in paragraph (a), a lawyer may participate with a prepaid or group legal service plan operated by an organization not owned or directed by the lawyer which uses in-person or telephone contact to solicit memberships or subscriptions for the plan from persons who are not known to need legal services in a particular matter covered by the plan.
The hearing panel found:
McCray, through Bradley Ross Law, P.C., funded seminars put on by Snyder and Bellwether, Inc. to solicit clients for Bradley Ross Law, P.C. at the Atlanta, Georgia seminar attended by Dr. McKenzie on February 26, 2005 for the pecuniary gain of McCray and Bradley Ross Law, P.C.
[¶ 24] McCray does not dispute that he and Bradley Ross Law, P.C., paid to sponsor numerous seminars on the topic of how to improve a person's credit scores. The seminars were aimed at attracting vulnerable persons who, like McKenzie, were unable because of bankruptcy or other reasons to obtain credit. Although McCray testified he instructed Snyder not to recommend his services at the seminars, McKenzie testified that Snyder recommended that Bradley Ross Law, P.C., could provide legal services for seminar participants. McCray's representatives *844 manned booths in a nearby room to sell the legal services of Bradley Ross Law, P.C., for pecuniary gain. Bradley Ross Law, P.C., was the only law firm to sponsor and to be present at the seminars.
[¶ 25] A "seminar . . . is a curious hybrid of advertising and in-person solicitation as well as a pure educational effort . . .," N. Keilin, Client Outreach 101: Solicitation of Elderly Clients by Seminar Under the Model Rules of Professional Conduct, 62 Fordham L.Rev. 1547, 1548 (1994), but the Rules of Professional Conduct do not expressly prohibit a lawyer's involvement in an educational seminar. However, improper solicitation of clients occurs when a lawyer involves himself with an organization that independently targets and solicits prospects for his representation. See Disciplinary Counsel v. Kramer, 113 Ohio St.3d 455, 866 N.E.2d 498, 501 (2007). We conclude there is clear and convincing evidence that McCray violated N.D.R. Prof. Conduct 7.3(a).

E
[¶ 26] McCray objects to the hearing panel's finding he violated N.D.R. Prof. Conduct 8.4(c) and (f) and N.D.R. Lawyer Discipl. 1.2A(3) and (8). Under N.D.R. Prof. Conduct 8.4(c) and (f), "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness as a lawyer . . . [and] . . . engage in conduct that is prejudicial to the administration of justice." Under N.D.R. Lawyer Discipl. 1.2A(3) and (8), "[a] lawyer may be disciplined for . . . [e]ngaging in conduct involving dishonesty, fraud, deceit or misrepresentation. . . [and] . . . [e]ngaging in conduct prejudicial to the administration of justice." The hearing panel found:
The letters written by McCray's law firm were dishonest and contained misrepresentations. Further, the conduct of McCray, in the operation of Bradley Ross Law, P.C., including the method in which Dr. McKenzie was solicited as a client and the process of sending dispute letters being written on Dr. McKenzie's behalf that were dishonest and contained misrepresentations, constitutes conduct which is prejudicial to the administration of justice.
[¶ 27] Soliciting vulnerable clients for pecuniary gain and charging unreasonable fees for mailing false and misleading dispute letters to credit reporting agencies in the clients' names is conduct that reflects adversely on the lawyer's fitness as a lawyer and is prejudicial to the administration of justice. We conclude the hearing panel's finding that McCray violated N.D.R. Prof. Conduct 8.4(c) and (f) and N.D.R. Lawyer Discipl. 1.2A(3) and (8) is supported by clear and convincing evidence.

F
[¶ 28] McCray objects to the hearing panel's finding he violated N.D.R. Prof. Conduct 8.4(g), which provides, "[i]t is professional misconduct for a lawyer to . . . engage in other conduct that is enumerated in the North Dakota Century Code as a basis for revocation or suspension of a lawyer's certificate of admission," and N.D.C.C. § 27-14-02(7), which authorizes revocation or suspension of a lawyer's license if the attorney has "[c]ommitted any other act which tends to bring reproach upon the legal profession." The hearing panel found:
McCray brought reproach upon the legal profession by inappropriately soliciting Dr. McKenzie as a client, inappropriately requiring Dr. McKenzie to proclaim by contract that she had sought out the services of Bradley Ross Law, P.C. in North Dakota, inappropriately *845 charging an unreasonable fee, and inappropriately mailing letters to credit agencies, purportedly sent by Dr. McKenzie, which contained false information and misrepresentations.
[¶ 29] A lawyer's conduct involving dishonesty, fraud, deceit, or misrepresentation adversely reflects on a lawyer's fitness to practice and tends to bring reproach upon the legal profession. Disciplinary Board v. Howe, 2001 ND 7, ¶ 15, 621 N.W.2d 361. We conclude McCray's conduct brought reproach upon the legal profession and the hearing panel's finding is supported by clear and convincing evidence.

G
[¶ 30] McCray objects to the hearing panel's finding he violated N.D.R. Prof. Conduct 5.5(e), which provides, "[a] lawyer shall not assist another person in the unauthorized practice of law." The hearing panel found:
McCray could not adequately represent 9,450 to 18,000 clients by himself, nor could he adequately supervise 25 to 30 leased employees of the firm located in Fishers, Indiana. McCray was assisting some or all of the 25 to 30 leased employees of Bradley Ross Law, P.C. in the unauthorized practice of law.
[¶ 31] The practice of law includes not only the preparation of legal instruments affecting the rights of others, but also the approval of the use of legal instruments affecting the rights of others. See Committee on Prof'l Ethics and Conduct v. Baker, 492 N.W.2d 695, 701 (Iowa 1992). McCray had 9,450 clients, and the vast majority of the work performed by Bradley Ross Law, P.C., i.e., mailing dispute letters, was performed by his leased employees in Indiana. McCray could not have given individual attention to all of his clients or sufficiently overseen the work performed by his leased workers in Indiana. In effect, McCray allowed the Indiana employees to practice law under his license. See Disciplinary Bd. v. Nassif, 547 N.W.2d 541, 543 (N.D.1996). We conclude the hearing panel's finding is supported by clear and convincing evidence.

H
[¶ 32] Disciplinary counsel objects to the hearing panel's finding McCray did not violate N.D.R. Prof. Conduct 5.4(a), which provides, "[a] lawyer or law firm shall not share legal fees with a nonlawyer." The hearing panel found:
With respect to File No. 4101-W-0408, the Hearing Panel has a concern about a potential violation of Rule 5.4 N.D.R. Prof. Conduct, Professional Independence of a Lawyer. McCray, through Bradley Ross Law, P.C., generates millions of dollars in gross revenue and pays approximately 95% of that revenue to Bellwether, Inc. or its affiliates. However, the record did not provide clear and convincing evidence that the fees paid by Bradley Ross Law, P.C. to Bellwether, Inc. or its affiliates were excessive or unreasonable such that they represented the sharing of legal fees with a non-lawyer.
[¶ 33] We disagree with the hearing panel. Ninety-five percent of the gross revenues generated by legal fees to Bradley Ross Law, P.C., were paid to Bellwether, Inc., or its affiliates, all controlled by Snyder, who conducted the seminars and recommended the legal services of Bradley Ross Law, P.C. Snyder reaped almost all of the income collected by Bradley Ross Law, P.C., in attorney fees. Whether Bellwether, Inc., or its affiliates were adequately compensated does not alter the reality that McCray shared legal fees with nonlawyers. See Nassif, 547 N.W.2d at 543 (lawyer's splitting of fees *846 with nonlawyer paralegals who performed most if not all of the work violated prohibition against sharing legal fees); In re Hear, 755 N.E.2d 579, 581 (Ind.2001) (money paid to lawyer for debt collection services performed by nonlawyer who recruited clients was improper sharing of legal fees).
[¶ 34] We conclude there is clear and convincing evidence that McCray shared legal fees with a nonlawyer in violation of N.D.R. Prof. Conduct 5.4(a).

III
[¶ 35] Both parties challenge the hearing panel's recommended sanction of a 120-day suspension. McCray argues the charges should be dismissed and no sanction be imposed. Disciplinary counsel argues disbarment is the appropriate sanction in this case.
[¶ 36] In Disciplinary Bd. v. Chinquist, 2006 ND 107, ¶ 21, 714 N.W.2d 469, we said:
In determining the appropriate sanctions for violations of the Rules of Professional Conduct, we are guided by the North Dakota Standards for Imposing Lawyer Sanctions. Disciplinary Bd. v. Edwardson, 2002 ND 106, ¶ 21, 647 N.W.2d 126. Under N.D. Stds. Imposing Lawyer Sanctions 2.0, potential sanctions include disbarment, suspension, reprimand, and assessment of costs. Disciplinary Bd. v. McKechnie, 2003 ND 170, ¶ 23, 670 N.W.2d 864. In determining the proper sanction, N.D. Stds. Imposing Lawyer Sanctions 3.0 directs that we consider "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors."
[¶ 37] Appropriate sanctions "in cases involving commission of an act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation" are set forth in N.D. Stds. Imposing Lawyer Sanctions 5.1:
5.11 Disbarment is generally appropriate when:
(a) a lawyer engages in serious conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
5.12 Suspension is generally appropriate when a lawyer knowingly engages in conduct which does not contain the elements listed in N.D. Stds. Imposing Lawyer Sanctions 5.11 but that seriously adversely reflects on the lawyer's fitness to practice.
Under N.D. Stds. Imposing Lawyer Sanctions 7.2, "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system." McCray's intentional conduct in this case adversely reflects on his fitness to practice law and caused injury or potential injury to McKenzie, the public, and the legal system.
[¶ 38] As aggravating factors under N.D. Stds. Imposing Lawyer Sanctions 9.2, *847 the hearing panel considered there was a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. See N.D. Stds. Imposing Lawyer Sanctions 9.22(c), (d), (g), and (i). As mitigating factors under N.D. Stds. Imposing Lawyer Sanctions 9.3, the panel considered the absence of a prior disciplinary record and full and free disclosure. See N.D. Stds. Imposing Lawyer Sanctions 9.32(a) and (e).
[¶ 39] Under the circumstances, we believe suspension is an appropriate sanction, but for a period longer than the 120 days recommended by the hearing panel. Considering the multiple offenses and McCray's refusal to acknowledge the wrongful nature of his conduct, we order that McCray be suspended from the practice of law for six months and one day and that he pay the full costs and expenses of the disciplinary proceeding.

IV
[¶ 40] We conclude there is clear and convincing evidence McCray violated N.D.R. Prof. Conduct 1.5, 4.1, 5.4, 5.5(e), 7.3(a), 8.4(c), (f), and (g), and N.D.R. Lawyer Discipl. 1.2A(3) and (8). We suspend McCray from the practice of law for six months and one day beginning October 1, 2008, and order that he pay the costs of the disciplinary proceedings in the amount of $7,808.66 under N.D.R. Lawyer Discipl. 1.3(D). McCray must comply with the notice of status provisions of N.D.R. Lawyer Discipl. 6.3, and upon expiration of the suspension period, must comply with the reinstatement provisions of N.D.R. Lawyer Discipl. 4.5.
[¶ 41] GERALD W. VANDE WALLE, C.J., STEVEN E. McCULLOUGH, D.J., and DALE V. SANDSTROM, J., concur.
[¶ 42] The Honorable STEVEN E. McCULLOUGH, D.J., sitting in place of MARING, J., disqualified.
KAPSNER, Justice, concurring.
[¶ 43] I concur in the discipline imposed and join in Parts I, II A, C, E, F, G, H, and III of the per curiam opinion. For reasons stated in my dissent to its adoption, N.D.R. Prof. Conduct 7.3(a), standing alone, is an impermissible and overly broad restriction on ordinary commercial speech and cannot form the basis of discipline. As noted in Justice Crothers' separate, however, the manner in which McCray conducted his solicitation of clients violated other disciplinary rules, one of which was not specifically included in the petition for discipline and, for that reason, cannot support disciplinary action.
[¶ 44] Carol Ronning Kapsner
CROTHERS, Justice, concurring in part and dissenting in part.
[¶ 45] I concur with Part I and with the conclusions in sections B, C, D, E, F and H of Part II. These Rule violations support suspension. I therefore concur with Part III of the Majority Opinion imposing sanctions. I respectfully disagree with the Majority's analysis as noted below, and I disagree with the conclusions in Part II, A and G because the findings or the violation of the respective rules have not been proven by clear and convincing evidence.

Violation of N.D.R. Prof. Conduct 7.3 and 7.2
[¶ 46] McCray's most significant misconduct relates to his solicitation of clients. I write separately on this issue because this Court should articulate what promotional activities are permitted, and what are prohibited, under N.D.R. Prof. Conduct 7.3. The Majority's passing mention that the Rules "do not expressly prohibit a *848 lawyer's involvement in an educational seminar" is true as far as it goes, but falls short of meaningful articulation of why McCray's arrangement violated the rule. See Majority Opinion at ¶ 25.
[¶ 47] Justice Kapsner and Justice Sandstrom questioned the Constitutionality of N.D.R. Prof. Conduct 7.3 at adoption. See N.D.R. Prof. Conduct 7.3 cmt., dissent. The questions they raised still exist. With the Rule now in place, their questions require that this Court take care to construe and apply Rule 7.3 in a constitutional, rather than an unconstitutional, manner. See Caldis v. Board of County Comm'rs, 279 N.W.2d 665, 669 (N.D.1979) (when statute subject to two possible interpretations, unconstitutional application should be rejected). Overall, an application consistent with constitutional limits for constraints on commercial speech means that we must permit marketing behavior that is not "false, deceptive, or misleading." Bates v. State Bar of Arizona, 433 U.S. 350, 383, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). For implementation of the concept in the context of solicitation, we can take instruction from Belli v. State Bar of California, where the court stated:
"We leave the bar's solicitation rule free to operate in areas not affecting constitutionally protected speech. We hold, however, that when the bar seeks to discipline an attorney for a communication incident to protected speech, in addition to showing that the attorney intended by his communication to generate business for his law practice, it must demonstrate that the communication or a part thereof was Principally directed toward this end. We build into this construction of rule 2 a belief that the speech interest prevails over the desire of the bar to minimize solicitation of legal business both because the former is anchored in the federal Constitution and because it is properly accorded a fundamental position within that document."
10 Cal.3d 824, 112 Cal.Rptr. 527, 519 P.2d 575, 581-82 (1974) (internal citations omitted). In Jacoby v. State Bar of California, the rule in Belli was further explained:
"[W]e synthesize Belli and Bigelow [v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975),] by concluding that a communication is not `primarily directed' toward solicitation unless, viewed in its entirety, it serves no discernible purpose other than the attraction of clients. If a legitimate purpose appears on the face of a publication or in the demonstrated motivation of the attorney, the publication must receive at least prima facie First Amendment protection."
Jacoby, 19 Cal.3d 359, 138 Cal.Rptr. 77, 562 P.2d 1326, 1334 (1977).
[¶ 48] Enforcement of our anti-solicitation rules within constitutional bounds permits lawyers to present educationally oriented classes, seminars and speeches to and for current and potential clients. Belli, 112 Cal.Rptr. 527, 519 P.2d at 581-82; Jacoby, 138 Cal.Rptr. 77, 562 P.2d at 1334 and at 1344 (Richardson, J., dissenting). Violation of 7.3 occurs when the seminar "serves no discernible purpose other than the attraction of clients." Jacoby, at 1334. Lawyers with questions of whether particular educational or solicitation activities are permitted can request and rely on ethics opinions from the State Bar Association of North Dakota pursuant to N.D.R. Lawyer Discipl. 1.2(B). Here, however, I agree with the Majority that McCray's client solicitations exceeded the limits permitted by a constitutional application of our rules.
[¶ 49] The record shows McCray solicited clients by "sponsoring" 25 marketing seminars a year presented by Bellwether, Inc. McCray, through Bradley Ross Law, *849 was one of six sponsors (and the only law firm sponsor). The Bradley Ross Law sponsorship was memorialized by a written "Marketing Agreement" requiring that McCray pay $10,833.33 per month in exchange for Bellwether's contractual arrangement. The Marketing Agreement provided:
1.1 General. Company and BRL [Bradley Ross Law] wish to establish a commercial relationship whereby BRL will become a sponsor of Company's seminar.
1.2 Company's Responsibilities.

1.2.1 Promote BRL in the seminar presentation.
1.2.2 Provide forms and other printed materials for potential clients to complete and read.
1.2.3 Provide employees to staff the BRL booth.
[¶ 50] Rule 7.3, N.D.R. Prof. Conduct, states, "A lawyer, or the lawyer's representative, shall not . . . solicit professional employment from a prospective client when a significant motive for the solicitation is the lawyer's pecuniary gain. . . ." The contract with Bellwether specifically required Bellwether to solicit clients for McCray, and even for Bellwether to provide personnel for a booth to have those who were solicited sign contracts of representation by McCray. This evidence establishes McCray violated Rule 7.3 when Bellwether promoted McCray's legal services at the seminar in exchange for $10,833.33 per month for the sole purpose of acquiring new clients.
[¶ 51] The evidence would also allow us to conclude McCray's contract and course of performance with Bellwether violated N.D.R. Prof. Conduct 7.2(d), prohibiting a lawyer from giving anything of value to a person to recommend the lawyer's services. That Rule provides:
"A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may
"(1) pay the reasonable costs of advertisements or communications permitted by this Rule;
"(2) pay the usual charges of a not-for-profit lawyer referral service or legal service organization; and
"(3) pay for a law practice in accordance with Rule 1.17."
Comment 5 to Rule 7.2(d) also is instructive and provides:
"Paying Others to Recommend a Lawyer
"A lawyer is allowed to pay for advertising permitted by this Rule and for the purchase of a law practice in accordance with the provisions of Rule 1.17 [sale of a law practice], but otherwise is not permitted to pay another person for channeling professional work. This restriction does not prevent an organization or person other than the lawyer from advertising or recommending the lawyer's services. Thus, a legal aid agency or prepaid legal services plan may pay to advertise legal services provided under its auspices. Likewise, a lawyer may participate in not-for-profit lawyer referral programs and pay the usual fees charged by such programs. Paragraph (c) does not prohibit paying regular compensation to an assistant, such as a secretary, to prepare communications permitted by this Rule."
N.D.R. Prof. Conduct 7.2 cmt. 5 (emphasis added). Rule 7.2(d) was violated when McCray paid Bellwether under the Marketing Contract for widespread improper solicitation of clients at Bellwether's seminars.
[¶ 52] The petition in this case did not allege a violation of Rule 7.2(d), so no *850 discipline can be imposed on this basis. However, McCray's pervasive and prolonged violations of Rules 7.2 and 7.3, as alleged and proven, warrant the discipline imposed by this Court. Therefore, while I agree and disagree with the Majority on some of the other allegations of misconduct, I concur with the suspension of McCray for six months and one day. Majority Opinion at ¶ 39.

Majority Opinion Part II, A: Hearing Panel Findings
[¶ 53] McCray challenges the hearing panel's findings that he performed little meaningful work on McKenzie's case and that the volume of files handled prevented him from having adequate time to represent McKenzie and the firm's other clients. The Majority adopts the hearing panel's finding regarding lack of adequate time based on simple math, indicating McCray was unable to spend more than 12 minutes on each of Bradley Ross Law's 9,450 clients. The Majority adopts the hearing panel's finding regarding a lack of "meaningful legal work" based on the nature of the letters sent on McKenzie's behalf. I question whether either of these findings are supported by clear and convincing evidence. However, I also question whether these findings are necessary to our conclusions that McCray violated the North Dakota Rules of Professional Conduct. I write separately out of concern that a future disciplinary action might be based on these questionable findings.
[¶ 54] The expansive factual findings made by the majority and by the hearing panel are suspect because we have only McKenzie's case file and the testimony of McKenzie, McCray and a former member of Inquiry Committee West. We have neither the testimony of, nor the case files for, any of McCray's other 9,449 clients. We therefore must exercise care about the sweeping conclusions being applied to all of McCray's clients based on the very small pool of evidence in this case.
[¶ 55] Among the limited evidence available is the "Client Support Notes," which essentially are McCray's time records for McKenzie's file. Those Notes are 25 pages long and have 62 separate work entries spanning from file opening on February 28, 2005 to post-file closing communications on February 9, 2006. McCray had one file contact on May 12, 2005 for "Attrny Review." The undisputed testimony was that legal assistants and hired staff made the remaining entries, many reflecting separate listings of similar work (i.e., an individual entry for each dispute letter mailed to Equifax, to Experian and to Trans Union, and individual entries for each email sent to McKenzie advising her of each dispute letter sent). This Court has approved a lawyer's use of legal assistants and office staff for appropriate support of the delivery of legal services. See N.D.R. Prof. Conduct 5.3 ("Responsibilities Regarding Nonlawyer Assistants"); Rule 1.5(f) ("A lawyer may charge for work performed by a legal assistant."); Rule 5.5(e) cmt. 12 ("Paragraph (e) does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for it."); Riemers v. State, 2008 ND 101, ¶ 11, 750 N.W.2d 407 (legal assistant fees recoverable as portion of court ordered attorney's fees). The question of McCray's supervision of the nonlawyer personnel is separately discussed in Part II, G of the Majority Opinion and in the text below. With supervision treated separately, we are left with the question about the extent of work done. On that question, McKenzie's Client Support Notes show considerable file activity over fifteen months in exchange for $590 paid by McKenzie. While the large number of *851 clients and the geographical separation between McCray and the nonlawyer staff is cause for concern, on the basis of this record I cannot agree the evidence clearly and convincingly establishes McCray and his support personnel did not have adequate time to represent McKenzie. Nor can I conclude that this evidence, which was nearly all centered on McKenzie, clearly and convincingly established McCray's support personnel did not have adequate time to represent the other clients.
[¶ 56] I also am not convinced the record supports the finding that McCray provided "little in the way of meaningful legal work." Majority Opinion at ¶ 15. We permit lawyers to limit the scope of representation, such as to assist a client who is otherwise representing himself or herself. See N.D.R. Prof. Conduct 1.2(c). As long as the client agrees, a lawyer also may be paid for performing non-legal work, i.e., work that may be done by a nonlawyer. This Court has recognized the concept of "law-related services" to include "services that might reasonably be performed in conjunction with and in substance are related to the provision of legal services, and that are not prohibited as unauthorized practice of law when provided by a nonlawyer." N.D.R. Prof. Conduct 5.7(b). Much of what is done in the business of credit repair likely could be characterized as a "law-related service" rather than as "legal services." See Iosello v. Lexington Law Firm, No. 03 C 987, 2003 WL 21920237, at *5-6 (N.D.Ill. Aug. 12, 2003) (Federal Credit Repair Organizations Act applies to lawyers and non lawyers alike). McCray would remain subject to regulation under the Rules of Professional Conduct if providing "law-related services." N.D.R. Prof. Conduct 5.7(a). However, whether McCray delivered a "law-related service" within ethical bounds is a far different question than this Court addresses by finding an attorney is or is not doing "meaningful work" for a client, or for 9,449 clients. This record fails to support a conclusion that McCray did "little meaningful work" for McKenzie or for the 9,449 clients about whom we know nothing. I therefore disagree that we should adopt the hearing panel's finding.

Majority Opinion Part II, G: Violation of N.D.R. Prof. Conduct
[¶ 57] The Majority agrees with the hearing panel's finding that McCray assisted the leased Indiana employees in the unauthorized practice of law in violation of N.D.R. Prof. Conduct 5.5(e). That conclusion might be supportable for McKenzie based on the testimony and the Client Support Notes if one could conclude the nonlawyer staff in Indiana was acting without McCray's supervision and control. However, we have little or no evidence on this point, and neither the hearing panel nor the Majority bases its conclusion on evidence pertaining to McKenzie. The little evidence we do have came from McCray, and he testified that he installed telephone, video and computer resources to allow for his immediate file review and to facilitate daily communications with the support personnel. He also testified he was physically present in Indiana more than 20 times in two years. The Majority and the hearing panel concluded, "McCray could not adequately represent 9,450 to 18,000 clients by himself, nor could he adequately supervise 25 to 30 leased employees of the firm located in Fishers, Indiana." Majority Opinion at ¶ 30. That conclusion was made without any record of the work required for clients other than McKenzie, the time and effort expended for those clients, or details about McCray's control and supervision over the nonlegal staff. On this record I am compelled to conclude we do not have clear and convincing evidence that McCray assisted his non-legal *852 staff in the unauthorized practice of law.

Majority Opinion Part II, H: Violation of N.D.R. Prof. Conduct
[¶ 58] The Majority rejects the hearing panel's conclusion that McCray did not improperly share fees with a nonlawyer. Majority Opinion at ¶¶ 32-34. By doing so, the Majority, properly I think, concludes McCray did engage in improper fee splitting with Bellwether or its affiliates controlled by Snyder. However, I do not agree with the Majority's rationale.
[¶ 59] The Majority concludes that improper fee splitting occurred because:
"Ninety-five percent of the gross revenues generated by legal fees to Bradley Ross Law, P.C., were paid to Bellwether, Inc., or its affiliates, all controlled by Snyder, who conducted the seminars and recommended the legal services of Bradley Ross Law, P.C. Snyder reaped almost all of the income collected by Bradley Ross Law, P.C., in attorney fees."
Id. at ¶ 33.
[¶ 60] Improper fee splitting occurred here because the Marketing Contract between McCray and Bellwether essentially made them partners engaging in a business enterprise of credit repair seminars conducted for Snyder to sell books and for McCray to solicit clients. As indicated above, McCray violated N.D.R. Prof. Conduct 7.2 and 7.3 by doing so and, in the process, improperly paid large sums of money to Bellwether. Being improper expenditures by a lawyer to solicit clients in violation of the Rules of Professional Conduct, I agree the payments amounted to improper fee splitting in violation of Rule 5.4(a). I cannot agree, however, that a fee-splitting violation can be found based alone on the percentage of McCray's income spent to support contracts with Bellwether.
[¶ 61] Both the hearing panel and the Majority fixated on the fact McCray generated millions of dollars and paid ninety-five percent of that sum to Bellwether or an affiliate. Majority Opinion at ¶¶ 32-33. That a lawyer spends ninety-five percent of his or her gross income with one contract vendor may speak of the lawyer's impending financial doom. But it does not speak of per se unethical conduct. To have such a rule would improperly, unwisely and, perhaps, unconstitutionally bring discipline on lawyers paying significant costs associated with starting a law practice, on lawyers engaging in heavy but authorized advertising to grow a practice, or on lawyers purchasing an existing law practice. See N.D.R. Prof. Conduct 7.2 cmt. 5 ("A lawyer is allowed to pay for advertising permitted by this Rule and for the purchase of a law practice in accordance with the provisions of Rule 1.17. . . ."). I therefore concur with the result reached in Part II, H but respectfully disagree with the Majority's rationale.
[¶ 62] Daniel J. Crothers